Caldwell, J.
íhe plaintiff, John C. Larwill, brings this action against Stevenson Burke, Charles G. Hickox, as administrator of Charles Hickox,deceased, The Snow Pork & Cleveland Coal Company, W. D. Lee, Eli Hull and others; and in his amended petition he states for his cause of action that about the month of August, 1873,-The Snow Fork & Cleveland Coal Company was organized as a corporation under the laws of Ohio, for purchasing and holding mineral lands and mining and shipping coal and iron ores in the Hocking Valley in said state, That for this purpose it purchased the fee simple title to 5619.86 acres of valuable coal and iron ore lands situated in the Hocking Valley and on the line of the Columbus,Hocking Valley & Toledo Railway Company; that the capital stock of the company was 30,000 shares of $100 a share, and there was subscribed and paid up 27,849 shares, and no more.
The plaintiff "claims that he is the owner of 2,860 shares, fully paid up,of the capital stock of The Snow Fork & Cleveland Coal Company. He sets out the numbers of his certificates representing the shares that .he holds, and says that all of his certificates bear date of February, 24, 1874, ex *452 cept one which bears date of June 10, 1874.
On the 30th day of September, 1881, and for some years prior the defendants Burke, Lee, and Oharles Hickox, were directors and also comprised the executive committee of the Snow Fork <te Cleveland Coal Company, and Burke was the president and Hickox was the vice president. And that in the summer of 1881, Burke and Hickox became largely interested as stockholders and otherwise in the Columbus, Hocking Valley & Toledo Bailway Company, a corporation at that time formed by the consolidation of three railway companies of Ohio, known as The Columbus, & Hocking Valley Railway Company, The Columbus & Toledo Railway Company, and the West Virginia Railway Company.
That the defendants, Burke and Charles Hickox, with their associates in The Columbus, Hocking Valley & Toledo Railway Company, desired to borrow money for the same and proposed to secure a loan by a mortgage on ali the property and franchises of said railway company; and for the purpose of further securing the proposed consolidated loan and of effecting an advantageous sale of said lands, they desired to subject to the lien of said railway company’s mortgage a large body of said railway company’s lands — coal and iron lands — situated on said railway, which said coal and iron lands included those belonging to said Snow Fork & Cleveland Coal Company; and for this purpose, Burke, Hickox and others sought to get control of the majority of the capital stock of the said Snow Fork& Cleveland Coal Company, and did purchase and get control of at leas.t four-fifths of the capital stock of said company. That shortly prior to the 30th day of September, A. D. 1881, for the purpose of enabling themselves to subject the said lands of the Snow Fork and Cleveland Coal Company to the said consolidated railway company’s lien and thereby enabling them in the manner hereinafter mentioned, to sell and dispose of the said lands upon desirable and advantageous terms, the defendants Burke and Hickox and others acting in their behalf and under their directions, organized under the laws of the state of Ohio a corporation called The Hocking Coal & Railway Company, and on or about September 29, 1881, said Burke and Hickox and Joseph Perkins-being a special committee of the directors of said company, appointed for that purpose, sold the said lands to the Hocking *453 Coal & Railway Company, wbioh sale was consummated on the 30th day of September, 1881, by the conveyance of said lands by deed executed and delivered to the railway company by Burke as president and Charles G. Hickox, son of Charles Hickox, as secretary of the Snow Fork & Cleveland Coal Company,
That the lands comprised all the property, assets and estate of The Snow Fork and Cleveland Coal Company. That the nominal consideration therefor was $842,979, but the real consideration received therefor being a portion of the capital stock of the said Hocking Coal & Railway Company, to-wit: $842,979 in amount at the par value thereof.
That on the day following the delivery of said deed to the said Hocking Coal & Railway Company, to-wit: on the 1st day of October, 1881, the Hocking Coal & Railway ' Company, at the instance and under the direction of said Burke and Hickox, united with the consolidated railway company in the execution and delivery of a mortgage qr deed of trust to the Central Trust Company of New York as trustee to secure the payment of $14,500,000 bonds of the said consolidated railway company; each for the sum of a thousand'dollars; by which said mortgage or deed of trust the said Hocking Coal & Railway Company conveyed to the said Central Trust Company the whole of said lands before then owned by the Said Snow Fork & Cleveland Coal Company.
That the said Central Trust Company upon the execution and delivery of the mortgage or trust deed accepted the trust. On or about the 1st day of October, 1881, for the purpose of effecting the sale of said lands at a desirable and advantageous price as aforesaid, and as a part of said plan, the said Burke and Charles Hickox exchanged the said stock received from the said The Hocking Coal and Railway Company, with the said consolidated railway company, for the mortgage bonds of-said last named company of the par value of $4,495,888.
That in carrying out their said plans and purposes, said Burke and Charles Hickox at once sold a large portion of said bonds, the plaintiff being unable to state the precise amount, and with the proceeds realized from such sale and *454 in pursuance of their said plans, purchased a large amount of the capital stock of the said consolidated railway company, the precise amount of such stock the plaintiff is unable to state; and they continued to hold such stock until the year 1885, or thereabouts, at which time they began and thereafter continued to dispose of portions thereof at large profits until about the year 1891; the plaintiff being unable to state what disposition, if any, has been made of such stock.
The plaintiff says that a portion of said bonds so as aforesaid received by the said Burke and Hickox, remained in their hands until about the 18th day of August, 1882, when they sold a portion thereof; the plaintiff being unable to state the consideration therefor, and further being unable to state whether the balance of said bonds has been sold or still remains in their hands,
The plaintiff sets out that in all that was done in and about this matter as before stated, Burke and Hickox acted in their official capacity as directors, officers, and members of the executive committee of the Snow Fork & Cleveland Coal Company, and received and held stock and bonds and the proceeds thereof in trust for said company and for each and all of its stockholders, and they so continued to hold and manage said properties in said trust character until the death of said Charles Hickox, which occurred in the year 1890, And that thereafter the defendants Burke and Charles G. Hickox, as administrator of the estate of Charles Hickox, hare occupied and still occupy the same trust relation in the premises, and are therefore liable in equity to account to the said company and ail its stockholders for the said stocks and bonds and the proceeds thereof; that such property now constitutes the entire assets and property of the said company.
The plaintiff then states that Burke and Hickox owning more than four-fifths of the capital stock of the Snow Fork & Cleveland Coal Company, and being a majority of the executive committee and directors of the company, they were in complete management and control of the same. And that since the date of the conveyance, there has been no change in the personnel of the management and control of the Snow Fork & Cleveland Coal Company except the *455 death of Charles Hickox, and Charles G. Hickox taking his place; and for this reason plaintiff says it was useless to call upon the company to commence suit against the defendants Burke and Charles G, Hickox,as administrator of the estate of Charles Hickox, deceased, to compel them’to account for the sale of stocks and bonds so received by them.
The plaintiff states that at the time of the sale of said lands he had no notice or knowledge of such sale or of the real' consideration received for the lands, and received no such knowledge until in the months of June and July, 1889.
The plaintiff then sets forth in his petition the bringing of the suit by him in Franklin county, Ohio, on the 25th day of May, 1886, against Burke and Hickox to recover judgment for his share of the proceeds of the sale of the lands. And summons was served upon Burke about the last of May, 1887, and no summons was ever served upon Charles Hickox in that suit, That the court of Franklin county sustained a demurrer to the petition on the ground that the action was barred in four years; and on the 26th day of August, 1891, the plaintiff filed an amended petition to compel Burke and Hickox to account for and pay over to him his share of the proceeds of the sale of said lands, and set up the same facts substantially that he had alleged in his original petition. And that thereafter, he made the Snow Fork & Cleveland Coal Company a party defendant to said action, and had the company served. And thereupon defendant Burke assumed to act on behalf of the company, but without authority of the directors, and for the purpose of hindering, delaying and embarrassing the plaintiff in his said case, procured the court to set aside and vacate the service of summons of the Snow Fork and Cleveland Coal Company. And that thereafter, on the 25th day of June, 1896, the plaintiff moved the court to dismiss the same without prejudice to any future action, and the court thereupon ordered the said case to be so dismissed.
Plaintiff says that there has never been any accounting by the said Burke and Hickox, or either o"f them, to the said Snow Fork & Cleveland Coal Company, nor has said company by reason of being under the control and management of said Burke and Hickox, ever demanded or required said parties to account to it for the said stocks and bonds or the proceeds thereof.
*456 That the object for which the said Snow Fork & Cleveland Coal Company was organized, has been practically abandoned, and that by reason of the premises the stockholders and all persons in interest are entitled to have an accounting by said Burke and Hickox of the proceeds of the sale of said lands and of all the profits received thereon, and to have the affairs of the company wound up, and to have a division of the assets made among the stockholders of the said company.
This constitutes substantially the plaintiff’s complaint against Burke and Hickox.
Plaintiff alleges for facts in his complaint against Lee and Hull that he is the holder of a number o,f certificates which he sets out in his petition, for a large number of shares, and says that between the .years 1873 and 1885, the plaintiff at the request of the defendant Lee loaned to him large sums of money at various times, for which loans he gave his notes, and sometimes the indebtedness was evidenced Jby bills of exchange drawn upon the plaintiff and paid by him for the accommodation of Lee and others; and all of which amounts the said Lee agreed to repay to the plaintiff with interest. That on many occasions when such notes were executed, the said Lee assigned in blank and delivered to the said plaintiff certificates representing certain shares of the capital stock of the said The Snow Fork & Cleveland Coal Company, issued in his name and in the names of others. That on other occasions, and especially during the years 1876 and 1877, Lee sold and delivered to this plaintiff certain other certificates representing shares of the capital stock of said company, some of which were issued in his name and some in the name of other stockholders of such company, endorsed by them in blank, and that he is unable to specify what particular certificates were so originally purchased by him from the said Lee and what ones were so deposited with him as security for said loans. That at the times when such certificates of stock were delivered to plaintiff as such security, it was agreed and understood between the plaintiff and the said Lee that all.the stock, so pledged with the plaintiff should be held by him at all times as security- to him for all debts that had at such times been incurred by the said Lee to the plaintiff and for alll such *457 debts as might be incurred by him to the plaintiff at any time while such stock should remain in the plaintiff’s hands. That during the time covered by such transactions the plaintiff made many loans to Lee, which were repaid to the plaintiff; the exact amounts and dates of which the plaintiff says he is unable to state; but that during such time Lee became further indebted to this plaintiff for loans evidenced by notes and bills in the amounts and at or about the dates following, to wit:
$12,500 October 1st, 1881, due January 15th, 1882: $12,500 October 1st, 1881, due February 2nd, 1882:
Twelve drafts or bills for $10,000 each, of June 3rd, June 5th, August 1st, August 15th, August 15tb, June 20th, August 20th, August 20th, August 20th, -August 20th, December 5th and December 20th, all of the year 1881; $10,000 September 1st, 1881; $2,000 September 17th, 1881; $5,000 September 8th, 1882; $5,000 November 8th, 1877; $6,000 September 27th, 1877; $4,200 July 25th, 1877; $4,000 June 7th, 1877; $2,000 April 26th, 1877; and $2,500 July 21st, 1877; all of which loans bear interest from the said respective dates or thereabouts.
That no part of such sums has been repaid to this plaintiff, except the $25,000 repaid to him in 1892.
That said Lee is further indebted to him upon three judgments, each for the sum of $10,000 and interest: one rendered in Delaware county in 1880, or 1882; another rendered in Coshocton county in 1878 or 1880; and the other, in Richland county in 1877 or 1878. And that no part of these judgments has been paid excepting a payment of between $2,000 and $4,000, the exact amount of which the plaintiff is unable to state.
Plaintiff says several certificates of stock issued in the names of the defendants Lee and Hull, were all delivered to him by the defendant Lee, indorsed in blank by the persons to whom the same were issued; that they have been either purchased by this plaintiff from the said Lee, or received' by the plaintiff from Lee as such security, and that all such stock was so received by the plaintiff prior to the year 1881 and has been held by him ever since without any knowledge on his part, and without any notice of' it having been given to him that the defendants Lee and' Hull, or either *458 of them, claimed to have any interest in any such stock until sometime during the year 1896.
The plaintiff then states that a controversy has arisen between the plaintiff and Lee and Hull as to whether he, the plaintiff, had bought such stocks,or as to whether they were simply deposited as collateral security; and he says Lee and Hull claim they were simply deposited as collateral security, and that the debts for which they were so deposited, have been paid and discharged, And the plaintiff then adds that if it shall appear that the said Lee and Hull stock was not a part of the stock so purchased by the plaintiff, but was stock pledged with him as such collateral, plaintiff has a lien thereon for all the indebtedness above mentioned.
His prayer is in accordance with the facts he has alleged.
Stevenson Burke and Charles G. Hickox filed to this petition an answer in which they make the answers filed by them to the original, petition, and the answer filed by them to the amended petition and all the statements and facts and allegations therein contained, a part of their answer to the second amended petition.
And they further aver that the said plaintiff is not now nor has he at any time been a stockholder in the Snow Fork & Cleveland Coal Company, and they deny each and every allegation made by the plaintiff in his second amended petition, of his ownership, legal or equitable, of any stock whatever in the Snow Fork & Cleveland Coal Company.
They aver that as to the 1,890 shares of stock standing in the names of A. G. Wyeth and H. M. Wyeth, about the 8th day of October, 1880, they were sold upon execution in proceedings in attachment against H. M. Wyeth to E, J. Estep, and after such sale E. J, Estep, upon producing due evidence of said proceedings and sale of the 1,890 shares of stock sold to him, new certificates were by said company issued to him in due form and for the full amount of 1,890 shares of stock, whereby Estep became the duly registered owner of said shares; and that on the 16th day of Octpber, 1880, said Estep,foy a valuable consideration,sold said stock standing in his name, to Charles Hickox then in full life, 473 shares; to Joseph Perkins, then in full life, 472 shares, to the defendant Burke 472'shares; and there was then reissued to the said Estep, of said stock, 473 shares; and on *459 June 23rd, 1881, the said Joseph Perkins and E. J, Estep* for a valuable consideration, severally sold and issued to the said Charles Hickox upon account of himself and the defendant Burke, the said 472 and the said 473 shares standing respectively in their names as by the issue made to them October 14th, 1880, whereby the defendants Burke and Charles Hickox became the true, absolute and registered owners of the said stock so standing in the name of said Joseph Perkins and E. J, Estep, and by the several transfers aforesaid became the owners of the entire 1,890 shares of stock of the said Snow Fork & Cleveland Coal Company for which the plaintiff pretends to hold certificates as in his petition stated, of all of which the plaintiff had due notice. That ever since the several transfers aforesaid, and especially ever since June 23rd, 1881, the defendants Burke and Hickox have been the owners of the entire 1,890 shares of stock theretofore standing severally in the names of A. G. and H. M. Wyeth.
And further answering, they allege that sometime later in the year 1881, the defendants are not able to state accurately the date but think it was in the month of December, 1881, said Burke being then the president of the said coal company and the owner of an undivided one-half of the said 1,890 of stock theretofore standing in the name of the said Wyeths, the said plaintiff called upon said defendant Burke and cláimed to be the owner of about 2,800 shares of stock, and then made demand of the defendant Burke, not only personally,but as president of the said Snow Fork. & Cleveland Coal Company, for the quota of the proceeds of the sale of the said stock to which, as he claimed, the certificates of stock which he held would entitle him. That said Burke most emphatically denied his right or title to participate in the proceeds of the sale of said coal lands or other property of the said Snow Fork & Cleveland Coal Company. That among other things said Burke distinctly called his attention to the fact that he was not the registered owner of any stock of said company, and that he, as director and president of said company, could not recognize him or any one else as an owner of stock therein, unless he was first registered as such owner. That the plaintiff did not then or at any other time show to Burke any stock certificates *460 whatever as belonging to him or any one else. That Burke then stated to the plaintiff that he and the said Charles Hickox were the registered and' actual owners of the said 1,890 shares of stock for which he (the plaintiff) claimed to hold certificates, representing the said A, G. and H. M. Wyeth to be severally the owners. That the said Burke then and there advised the plaintiff to proceed in court to ■establish his title to the said stock so claimed by him, and ■distinctly informed him that until he did so and the court held him to be the owner of said stock, he could not, in any respect, recognize him as such or treat him as such owner.
That these defendants answering, have, neither of them, •at any time regarded or treated the plaintiff as the owner of ■said stock theretofore standing in the names of the said Wyeths; nor .have they, or either of them, ever treated or regarded the plaintiff as being the owner of a single share •of the stock, and they have never recognized him as the owner or holder of any stock or entitled to any accounting ■from the Snow Fork & Cleveland Coal Company upon account of being a stockholder therein. And they deny any trust relation to the plaintiff, of any kind whatever, in regard to stock certificates, if any, which he holds or has held in ■the Snow Fork & Cleveland Coal Company. That they have at all times repudiated and denied his right as their ■cestui que trust or otherwise, to participate to any extent in the property or monies of the said Snow Fork & Cleveland Coal Company.
In the former answer which is made a part of the answer to the second amended petition, Burke and Hickox had plead the statute of limitations, both as to the plaintiff and •as to Lee and Hull.
W. D. Lee files his answer to the petition, in which he averred that the plaintiff is not the owner of the stock in the Snow Fork and Cleveland Coal Company represented by ■certain certificates, giving their numbers and the number of shares of each, but that he is the owner of the stock represented by said certificates. He says the certificates were originally issued to him, and that the stock has, ever since the issue thereof to him, stood in his name upon the books of the company, and they have never stood in any other ■name upon said books. He says that he never sold the *461 stock, or any part thereof, to the plaintiff or to any other person or persons, and that during all of said years he has been the registered and legal owner of all of said stock. He says that the stock represented by said certificates, is not now, and was not at the commencement of this action, nor was any part thereof, pledged with the plaintiff for the security of any indebtedness from him, and that the plaintiff has no lien upon or interest therein as security for the payment from him of any indebtedness from this defendant. And he denies that he was at the commencement of this action or that he is now indebted to the plaintiff in the said sums stated in said second petition, or any part thereof. And he pleads the statute of limitations, both the ten-year section and the fifteen-year section. And he files a cross-petition against the company and Burke and Hickox, setting up substantially the same cause of action as is set up in the petition against Burke and Hickox.
Eli Hull filed an answer to the petition, in which he sets forth certain certificates by their numbers and the amount of shares in each, and says that the plaintiff is not the owner of said certificates or shares, but that he is the owner, and that the certificates were originally issued to him at their dates, and that the stock has ever since stood in his name upon the books of the company, and has never stood in any other name, and that no part of the stock.was ever sold by him or by any one to the plaintiff or to any other person. And he concludes that he is the legal owner of the stock. He answers that the stock was not pledged to the plaintiff for any security of any indebtedness from the defendant, and that the plaintiff has no lien thereon or interest therein as security for the payment to him of any indebtedness of the said defendant Lee whatever. And he denies that at the commencement of this action he was, or is now, indebted to the plaintiff, and he pleads the statute of limitations, and files the same cross-petition that Lee does.
The Snow Fork & Cleveland Coal Co. files an answer to the second amended petition, in which it is asked and makes a part of its answer, the answer to the first petition and to the first amended petition; and further says that it denies that the plaintiff is now or ever has been a stockholder of *462 the Snow Fork & Cleveland Coal Company, and sets up substantially the same defenses as are set up in the answer of Burke and Hickox.
The cross petitions of Lee and Hull are answered by Burke and Hickox in substantially the same way that they answered the petition. In both of which answers it is claimed that the Snow Fork and Cleveland Coal Company’s lands were sold at $150 per acre to the Hocking Coal & Railway Company, and that they were not sold for $800 an acre, and that averment in the answers is denied.
The plaintiff in reply to the answer of Burke and Hickox states that the judgment obtained in the court of common pleas of Cuyahoga county, on which the Wyeth stock was sold, is a void judgment and of no binding force nor effect, because there was never any summons issued in the case, and claims that the judgmenet is void and hence of no effect at all by way of depriving him of any rights he had in said stock.
We will not undertake to review the evidence in detail in this case, but will content ourselves with stating some of the conclusions we have arrived at from the testimony.
In 1881, The Columbus & Toledo Railway Company, The Columbus & Hocking Valley Railway Company and the Ohio & West Virginia Railway Company were railroad corporations organized under the laws of the state of Ohio. The Columbus & Toledo Railway Company had a capital stock of $1,039,500, divided into 20,790 shares of $50 each, and owned and operated a railway betwern Toledo, Ohio, and Columbus, Ohio. The Columbus Hocking Valley Railway Company had a capital stock of $2,994,100,divided into 59,882 shares of $50 each, and it owned and operated a railroad between Columbus and Athens, Ohio, by way of Logan. The Ohio & West Virginia Railway Company had a capital stock of $750,000, divided into 15,000 shares of $50 each, and owned and operated a railway between Logan and Pomeroy, Ohio. These three companies taken together formed a direct line from Toledo on Lake Erie to Pomeroy on the Ohio river,, passing through the Hocking Valley coal region of Ohio.
There was an outstanding mortgaged indebtedness on the three roads amounting to $6,500,000.
*463 Stevenson Burke, Charles Hickox, O. H. Andrews, Wm. J. McKinnie, W C. Andrews, Wna. J. Hitchcock, M. P. Payne and Payne, Newton & Company, were all duly interested in coal lands lying adjacent to the Columbus & Hocking Valley Railway, and some' of them being the principal stockholders in The Snow Pork & Cleveland Coal Company, of which Burke was the president, and that company owned 5,619.86 acres of coal lands, and others of the above-named persons were stockholders in the Continental Company of which McKinnie was the president, and that company owned three thousand acres.
In June, 1881, Burke and his associates, which includes the above-named persons, formed the plan of buying the stock of these three railway companies and adding to their coal lands enough to make 10,000 acres in all — and this with a view of consolidating the coal and railway companies under one management, and of raising on the properties, thus consolidated, security. They estimated these coal lands to be worth a million and a half dollars; and the stock of the railway company they estimated to be worth six million dollars and a half ($6,500,000). And they took to their assistance M. M. Greene, who was the president of each of the three railway companies, to whom they promised a share of the profits, and, in order to accomplish this end, they secured, in addition to the lands owned by the two coal companies, 1,380.14 acres to make the sum of 10,000 acres in all.
In July, 1881, they entered into an agreement with Drexel, Morgan & Go., Bankers, of New York city, through Winslow, Lanier & Co., bankers of the same city,to borrow $6,000,000 on their joint and several notes for $250,000 each, dated July 1st, 1881, and payable 4 months after date. They secured these notes upon the responsibility of the signers of them and upon a pledge of their stock in the Snow Pork & .Cleveland Coal Company and The Continental Company, and agreed to turn over as further security the stock in the railroad companies from time to time as purchased with the money so borrowed. And after these lands were all secured, the arrangement was that they would issue the 5 per cent, bonds of that company, secured by a mortgage on the railroad and on the 10,000 acres of *464 coal lands to the amount of $14,500,000,and would reserve $6,500,000 bonds to take up the outstanding mortgage bonds of the different roads, and would pledge the rest of the bonds, $8,000,000,and also the stock of theconsolidated company as security for the loan; and then, in addition to this $6,000,000 borrowed as stated, there was raised $320,150.61 in cash from Hickox, and they borrowed $350,000 from the Deshler Company of Columbus, Ohio, upon the note of Burke, Hickox, Andrews, Hitchcock & Co., and McKinnie, and this was at first temporarily secured by the stock of the several railroad companies, and later by 350,000 of the bonds of the consolidated company.
The net amounts realized from the monies thus obtained, were used in purchasing the stock of the three railway companies, except a few shares in the Columbus & Hocking Valley Railroad. And thereupon, on July 19th, 1881, the roads were consolidated under the approval of the stockholders, and there was formed the Columbus, Hocking Valley & Toledo Railway Company having an authorized stock of $20,000,000 of which there was issued to Burke and his associates, $10,316,700 in exchange for their stock in the three original companies.
On September 30th, 1881, Burke and his associates caused the Hocking Coal & Railway Company, to be incorporated and organized under the laws of Ohio, with a capital stock of $1,500,000. This company purchased from the Snow Fork & Cleveland Coal Company its 5,619 86 acres of coal lands, and it obtained the 3,000 acres belonging to the Continental Coal Company, and obtained from Burke and Charles Hickox 1,380.14 acres — making the 10,000 acres. On October 1st, 1881, The Hocking Coal and Railway Company executed a joint mortgage with the Columbus, Hocking Valley & Toledo Railway Company to the Trust Company of New York, covering the railroad and the coal lands, for $14,500,000. That the sale of the Snow Fork & Cleveland Coal Company’s land was at the rate of $150 per acre, which was the full value of those lands. That the sale was made without any fraud or any unfair dealing, and without injury to any of the stockholders of the Snow Fork & Cleveland Coal Company.
The sale was made by a committee appointed two years *465 or thereabout before the time of making the sale by the directors of the company, and the directors in a meeting approved of the sale as made, and the stockholders in a meeting in which nearly all the stockholders were present, ratified the action by which the sale was made, and the terms were clear and well-defined, and the parties to whom the lands were being sold were known by the stockholders.
The only objection that can be made to the validity of the sale is that Burke and Hickox, and perhaps others, were owners of the stock in the Hocking Coal & Railway Company to whom the sale was made, and being officers or stock holders in both companies,and being parties to the contract both by the party selling and the one purchasing, that the contract would be invalid, and that the stock holders of the Snow Fork and Cleveland Coal Company can now secure the full amount that was realized for these lands by the Hocking Coal and Railway Company. If no director in the Snow Fork & Cleveland Coal Company had been interested in the Hocking Coal & Railway Company, then no one would think, under the circumstances, of making any claim to more than the $150 an acre. But the fact that certain parties or persons were directors in both companies, and that there were stockholders in the Hocking Coal & Railway Company that were not in the Snow Fork & Cleveland Coal Company at all, would make it inequitable to such persons as belonged only to the Hocking Coal & Railway Company; and besides, if no one was wronged by reason of the directors of the Snow Fork & Cleveland Coal Company being interested in the Hocking Coal & Railway Company, then no one has a right to complain.
It turned out that Burke and Hickox realized through t-hs sale of these lands to the railroad company, more money perhaps than $150 an acre, but that will make no difference if the other stockholders received all that the land was worth. The Syndicate, composed of the persons who formed the Hocking Coal & Railway Company and who Dorrowed very large sums of money, and undertook the enterprise of purchasing these three railroads and consolidating them into one and of buying these 10,000 acres of coal land, took upon themselves very great responsibilities and very heavy *466 financial obligations. Had the scheme failed at any point, there would have been large losses, and the chances to make taoney depended largely on making the plan from beginning to end work, and being able to dispose of the stock of the consolidated company and of the bonds. And it would not be equitable at this time, after the parties took all that responsibility and financial obligation and in the end realized more than the stockholders in the Snow Fork Company 'that were not in the syndicate, to allow them now to come in and recover the full amount realized, under the mortgage, for the lands without tBking any risk or any obligation upon the carrying out and working of the plan instituted by the syndicate. It would certainly be much more inequitable to allow them thus to recover to the full extent of their claim than it would be to confine them to the full and fair value of the property they parted with at $150 per acre, which amount they fairly and understandingly agreed to take for their property.
Under these facts, we conclude that the plaintiff and Lee and Hull under their cross-petition can recover no more at this time than the $150 an acre for the lands sold by the Snow Fork & Cleveland Coal Company.
It will not do to say that Burke and Hickox were trustees for the stockholders of the Snow Fork & Cleveland Coal Company, and that whatever they realized for this property they must account for. That might be true if the stockholders had not, either by their vote in the stockholders’ meetings, or by acquiescence, consented to a sala of the lands at $150 per acre, their full value. Those who make this claim, would not for a moment admit that if Burke and Hickox had done all that they did in the sale of the Snow Fork lands with and by the consent of the stockholders and had thereafter as stockholders in the Hocking Valley & Railway Company realized less than $150 per acre for the lands, that they could cause the stockholders of the Snow Fork Company to take less than $150 an acre for the lands.
We find no foundation in the claim that the stockholders of the Snow Fork & Cleveland Coal Company can now obtain more than the .$150.an acre.
The plaintiff applied to Stevenson Burke in New York in the month of December, 1881, to be let into the syndicate *467 to the extent of a certain number of shares which he then claimed he had. Mr. Burke, in a positive manner, refused to acknowledge him as having any interest in the syndicate or any right to come in, or any right to the amount that was received-by the syndicate for the coal lands.
On that occasion Burke informed him that he was not a stockhholder by the books of the company, and that he did not own any stock,and that he had no claim for any part of the funds realized for the lands. About the same time the plaintiff applied to Charles G. Hickox, the secretary of the Snow Fork and Cleveland Coal Company, to have l'OO .shares of stock for which he held a certificate transferred to him upon the books of the company, and he says that it was refused him, and that he was told that no stock should be transferred to him on the books. Mr. Hickox says that he refused him, and told him that the books had been closed for the stockholders’ meeting that was to be held that day, and told him some other reasons which he does not clearly remember.
But the evidence on this subject clearly shows that the plaintiff was denied any right to participate in a division of the funds realized for the Snow Fork lands, and he was denied any right to any of the Wyeth stock,or to any stock in the company. He was then told that the Wyeth stock had been attached and sold to E. J. Estep, and that certificates had been issued for the same to Estep. He was told this in December, 1881. And he was given to understand that he would not be recognized in any way by the company as a stockholder until he had established his rights as such in a court of justice.
The plaintiff did nothing after the conversation in 1881, until the bringing of this action in the Franklin county court at Columbus against Burke and Hickox. Burke only was served; Hickox was not.
Again, in this action, the plaintiff understood and averred that he had been denied any rights by reason of any stock that he held, and that he could have no rights to participate in any part of the funds of the corporation without his rights as a stockholder were established by law.
That action continued in court for a number of years,and was finally dismissed by the court upon his motion in May, *468 1896. In less than a year thereafter, he commenced this action.
H. M. Wyeth and A. G. Wyeth were stockholders in the Bnow Fork and Cleveland Coal Company. H. M. Wyeth had 1,000 shares, and A, G. Wyeth had 890 shares. In 1874 H. M. Wyeth pledged as collateral security these stocks to the plaintiff for a loan, and in 1887 the plaintiff acquired from H. M. Wyeth the equity of redemption which up to that time remained in him; and from that time, in 1887, to the bringing of this action, he claims he was the owner of said 1,890 shares of stock.
Burke and Hickox claimed to own this same stock.
Proceedings in attachment were commenced against H. M, Wyeth in 1878, brought by the Snow Fork and Cleveland Coal Company upon an indebtedness said to have existed in favor of the company against said H, M. Wyeth. Such proceedings were had in that action, that, on April 25th, 1880, the stocks were sold by the sheriff and bid in. by E. J. Estep and E. J. Estep presented his claim to the corporation, and the shares were transferred to him on the books of the coal company October 8th, 1880. And that, thereafter, prior to 1887, E, J. Estep traansferred the stocks bid in by him, the 1,890 shares, in part to himself, in part to Joseph Perkins, in part to Charles Hickox, and in part to Stevenson Burke; and new certificates were issud by the company to these several holders of the stock. . And thereafter transfers were made so that Burke and Hickox became the owners of record of all of said stocks.
In the action of the Snow Fork & Cleveland Coal Company against H. M. Wyeth no summons was issued, nor was there any affidavit made and filed in the court for service by publication.
After these several transfers the conversation heretofore referred to between Burke and Larwill in New York, was had, at which meeting Burke informed Larwill of the proceedings in attachment against" Wyeth, and told him that the stocks had been sold to Estep, and that he and Hickox were the owners of all of said stocks, and that they would pay him no part of the money coming from the Snow Fork lands, so far as the Wyeth stock was concerned,
The plaintiff took no action until the bringing of his suit *469 before referred to in Franklin county, Ohio. That suit was commenced May 27tb, 1886. That was the day of filing the petition, and the summons was then issued. The summens upon which service was made upon Stevenson Burke, was not issued, however, until sometime later, April 23rd, 1887.
Stevenson Burke demurred to the petition in this suit, and the demurrer was sustained on the ground that the statute of limitations of four years had run. The action, as commenced, was one at law. An amended and supplemental petition was filed August 17th, 1887, in which the plaintiff undertook to convert his action into one in equity, and thereafter had the Snow Fork & Cleveland Coal Company made a party to the action; but upon the motion of Stevenson Burke, Attorney for the Coal Company, service upon the Snow Fork Company was set aside. And at the April Term, June 25th, 1896, of that court, the plaintiff came by his counsel, and in open court made nrr¡] motion that his petition and action be dismissed without prejudice, without record, and at his costs. And thereupon it was ordered by the court that the petition and action of said plaintiff be and the same were dismissed without prejudice to a new action.
Under these facts it is claimed by the defendants, Burke and Hickox, that the statute of limitations is well plead to this action so far as it seeks to have the plaintiff recognized as the owner of the Wyeth stock.
The plaintiff claims that there being no issue of summons in the attachment case, the court never had jurisdiction either of the person of H. M, Wyeth or his property sought to be reached by the proceedings in attachment, and that the judgment entered therein is void and had no effect whatever in transferring the title from H. M. Wyeth to E. J. Estep. And it is claimed further that even if there had been service, the plaintiff, not being a party to that action, it would not be binding upon him,nor could it in any manner cut off any interest he might have in the stock by reason of having taken it as collateral for a debt owed him by H. M. Wyeth prior to said proceedings in court.
As to this claim that no title could have been transferred had the action in attachment been according to the provi *470 sions of the code, and without notice of any transfer, we do not deem it necessary to decide that question; it is one,upon which courts are divided, It has been held in Massachusetts and a number of other states, under statutes similar to our own, allowing such property to be attached, that the statutes refer to the interest of the registered stock holder in the corporate property,and that that is what is reached by the proceedings; and while another may at the same time hold the stock by assignment in blank which he has never seen fit to present to have the stock transferred to him by the company, that the evidence of the stock that he holds is nothing but the certificate which is evidence and nothing more of the real shares in the corporate property, and it is treated something as a secret lien which in most states at this time is entirely prohibited and disregarded both by the legislature and the courts.
There are other states holding to the contrary. In this state, Norton v. Norton 43 Ohio St., 509, plaintiff regards as conclusive.
It is said that if no summons was issued, we should now follow the circuit court of the sixth circuit, in the case of Smith v. Whittlesey, 19 Circuit Court Reports, page 412. Which case holds that if the defendant is a nonresident of the state, the summons becomes of no use, as it can not be served; and hence, if it is not issued at the time of filing the petition and before the attachment proceedings, it is not a fatal error because it would be a useless thing to do, But if we were to follow that decision, we would find ourselves met by another trouble.
There was no affidavit filed in the case to obtain service by publication; these steps both being required by the statute, and both being conditions precedent to the court taking jurisdiction either of the person or of the property.
We can not say that they can be overlooked,
And we hold that no jurisdiction was had in the case, either over the person of the defendant,or the property that was subjected to the attachment proceedings and sold by the court.
It follows from what we have said, that the court had no jurisdiction to render the judgment it did, and had no jurisdiction to have ordered the property sold, and a party pur *471 chasing would get no title as against either H. M. Wyeth or the plaintiff; but the plaintiff would not be justified for this reason, in treating what was done thereafter by the company in transferring the stock to Estep, as a nullity,for that action created a cloud upon his title and a claim under which others would and did claim a better right to the stock than he had.
Estep presented his claim to the directors of the company, presumably upon this judgment and the sale of the stock, and the company acting upon the facts presented to them, transferred the stock to Estep on the books of the company. 0 This was wrong, as we now see it, but, nevertheless, it was a proceeding that made Estep upon the books of the company, the holder and owner of the stock, and the plaintiff waB called upon to act to remove this cloud upon his title, and especially so after he was told by those owning the stock under transfers from Estep, that, under no circumstances, would he be paid anything out of the funds of the company until he established a right to the stock be'ier than that of the persons then claiming to own it. This called upon the plaintiff to act, and act at once. I! gave him at that time a cause of action. He could have proceeded against the company for the wrongful transfer of the stock upon its books and obtained damages for such wrong. He could have proceeded in equity to establish his right in the stock, and in the same action could have asked for a transfer of the stock upon the books, of the company in his name; or he could have omitted such prayer, and" prayed merely for his proportion of the funds to be divided; but the same proof in the equity case would be required, whether he asked for a portion of the funds simply, or whether he asked for a transfer of the stock on the books of the company to him, and for a proportion of the funds — it would be the same action.
This action was not commenced until the proceedings bad in the Franklin county case were ended, and it is claimed that the. statute had not run at that time when that action was brought, and that that action being dismissed without prejudice and this action commenced in less than a year from the dismissal of the other, that the statute of limitations has not run.
*472 We can not agree with this conclusion, for the reason that we believe it is contrary to the doctrine laid down in Siegfried v. R. R. Co., 50 Ohio St., 294,
The syllabus of that case is:
“Where an action which has been commenced in due time is dismissed by the plaintiff after the time limited for the commencement of such action has expired, a new action for the same cause thereafter commenced, is barred though commenced within one year after the dismissal of- the former action, Such dismissal is not a failure in the action within the purview of section 4991,Revised Statutes.”
Archer v. The Chicago, Burlington & Quincey Ry. Co. 65 Ia., 611.
Under section 4991, the new action to be commenced within one year after the party has failed in his first action otherwise than upon the merits, must be the same as the first action.
This is not the same action as the one commenced in Franklin county. It has not the same parties. In the first action John C. Larwill was the plaintiff and Stevenson Burke was the only defendant. In this action, there are a number of defendants besides Burke, and for this reason section 4991 has no application.
Hughes v. Brown, 88 Tenn., 578; Sidener v. Gilbrath, 63 Ind., 89; Merritt v. Monticello, 66 Fed. Rep., 165; White v. Moss, 92 Ga., 244.
This leads to the conclusion that the bringing of the action in Columbus and dismissing it, did not save the running of the statute of limitations, and that the present action being brought after the statute of limitations had run, is subject to the plea of the statute of limitations. But it is claimed that as to the action we are now speaking of, being one in equity, the statute of limitations does not run: first, because Estep got no right at all under the attachment proceedings; secondly, because the proceedings on behalf of the company issuing stock to him could only have been done by reason of the proceedings in the attachment case, and that therefore, the company acted without any authority in issuing the stock, and hence the statute would not run.
We'have already said all that is necessary as to the pro *473 ceedings by the directors in issuing stock to Estep, being sufficient to call upon the plaintiff to act before the statute of limitations had run against any proceedings that he might bring, And the other question we think is decided in the case of The Cleveland & Mahoning Railway Co., v. Robbins et al., Adm’rs. of Elias Eassett, 35 Ohio St. 483. In that 'action the transfer of the stock by the company was wrongful and without any authority as against the party who held the certificate of stock; and the court held that until the transfer of Ihe stock to the holders of the original certificate was refused, or they had notice of the transfer of the stock to other parties, the statute of limitations did not begin to run. This, I take from the fourth paragraph of the syllabus of the case, That taken in connection with what the court says in its opinion, we think is equivalent to the court’s holding that if the party delays a sufficient length of time after he has knowledge that his stock has been transferred to others, that any action he may bring upon his stock for any part' of the property of the company will be barred.
This same doctrine has been repeatedly applied in courts of equity where the courts follow the rule that equitable actions are barred in analogy to the barring of actions at law.
Since the adoption of the code in our state and in others this doctrine of barring suits in equity in analogy to the law pertaining to limitations of actions at law, has no place in our jurisprudence, for the statute of limitations in this state, as well as in nearly all states having a code, applies to the civil action.
Chinn v. Trustes, etc., 32 Ohio St., 236:
“The civil action of the code is a substitute for all such judicial proceedings as were previously known either as actions at law or suits in equity, and does not embrace proceedings in mandamus.”
And in that case the court held that there was no limitation to an act’on in mandamus because it was not included in the code definition of civil action, and determined that all cases coming under the term of civil actions in the code are now barred under the statute of limitations; or, in other words, that the statute of limitations applies to all civil actions, unless specially excepted.
*474 So that it becomes important to examine the cases where a limitation has been applied in equity, for, in all such cases now coming within Ohio, they would be barred under the statute of limitations. In line with Railway Company v. Robbins, is: Newberry v. Detroit, etc., Co., 17 Mich., 141; York v. Passaic Rolling Mill Co., 30 Fed. Rep., 471; Wonson v. Fenno, 129 Mass., 405; 10 Blatchford, 173; 76 Mich., 498
The plaintiff,then,was told in 1881 that the stock that he claimed, namely, the Wyeth stock, had been transferred on the books of the company to E. J. Estep, and that Burke and Hickox were then the owners of the stock, and that he could recover nothing on the stock until he established a better right to it in the courts This he neglected to do until the commencement of this action in 1896, too late to be allowed to recover as against the plea of the bar of the statute of limitations.
If we are right in this conclusion, it follows that the plaintiff has no title or interest in the Wyeth stock that can be recognized in the division of the assets of the Snow Fork and Cleveland Coal Company,
But suppose that we may be wrong in this, and that he is entitled now to be recognized by the courts as the owner of the Wyeth stock, and that he can prosecute the action that he has set up in his petition, for the recovery of his pro rata share of the money realized under the sale of the Snow Fork and Cleveland Coal Company’s lands.
It is claimed that to that action the statute of limitations has run and it bars his recovery, and the statute of limitations is made a defense to this action, not only as to Larwill, but also as to Lee and Hull. And it becomes neces sary to determine that question as to Lee and Hull, even though we should hold as above that Larwill is estopped by the statute from claiming the Wyeth stock that is now held by Burke and Hicxox..
The petition in this case, as well as the cross-petitions, are framed to hold Burke and Hickox as trustees of the coal company, and also as trustees of the stockholders. And it is brought by the stockholders, as it is claimed, because the company is under the control of Burke and Hickox, and has been under their control and that of .others who were with *475 them, ever since 1881; and that it is useless to ask the company to bring any cause of action that it may have against Burke and Hickox, and, therefore, they bring this action themselves. And it becomes important to inquire what ac- ' tion it is they bring.
A stockholder in a corporation has no right to bring a suit in his own name upon a cause of action existing in the corporation and in which the corporation itself is the proper complainant, except where it actually or virtually refuses to institute or prosecute such suit. The corporation holds the title, legal or equitable, to the corporate property, and is as a rule the only proper party to sue for wrong dealings with its property. If, however, the corporation is unwil ing or unable to sue, then a stockholder has the right to institute proceedings in equity for the protection of his interests in the corporation. The reason why he is allowed to do this when he has no estate in the corporate property, either legal or equitable, is stated by Mr, Pomeroy as follows :
“The stockholder does not bring such a suit became his rights have been directly violated, or because the cause of action is his, or because he is entitled to the relief sought; he is permitted to sue in this manner simply in order to set in motion the judicial machinery of the court. The stockholder, either individually or as the representative of the class, may commence the suit and may prosecute it to judgment; but in every other respect the action is the ordinary one brought by the corporation; it is maintained directly for the benefit of the corporation, and the final relief, when obtained, belongs to the corporation, and not to the stockholder-plaintiff. The corporation is therefore an indispensably necessary party, not simply on the general principles of equity pleading in order that it may be bound by the decree, but in order that the relief when granted, may be awarded to it, as a party to the record, by the decree.”
Mount v. Radford Trust Co. et al., 93 Va. 427; DeMelville v. N. Y. Ry. Co., 81 Fed. Rep., 10; Porter v. Sabine, 149 U. S., 478; Hawes v. Oakland, 104 U. S., 450.
From these and many other authorities it seems that when the stockholders bring the action against the directors for *476 any misconduct or for any acts ultra vires,that it is the corporation, after all, that is suing. It is the corporation’s ■action, only set in motion by the stockholders, because the corporation was made helpless by the erring directors, and the other stockholders are allowed to bring the action in order to right a wrong that otherwise would go uncorrected,
It is urged on behalf of Burk« and Hickox that the action on behalf of the company has become barred by the statute of limitations; that it might have sued the directors at any time after December, 1881, to recover the amount for which the Snow Pork and Cleveland Company’s lands were sold, computed at $150 an acre. It then knew that Burke and Hickox had received the money; and it then know that it was their dusy to turn it over to the company that the company might distribute it among the stockholders, and if it did not bring that action, as it never did, the statute of limitations would be in bar unless the trust relation of Burke and Hickox to the company is one that will only be recognized in a court of equity.
This is certainly no such a trust. And, by saying this, we do not mean to say that it is not a continuing and subsisting trust. But whatever trust it may be, the law gives ample power on the part of the company to enforce it by an action at law to recover what is due to it, in the same manner that any creditor may sue his debtor for what is due him and recover in the action.
And it is urged that because this suit is instituted by the stockholders for the company instead of by the company itself, it can make no difference; it is still the company’s cause of action and that cause of action is a civil action and hence it is barred, it is claimed, by the statute of limitations.
On the other side, it is claimed that the directors are the trustees not only for the company, but for the other stockholders, and that that trust relation gives rise to certain rights on behalf of the stockholders whenever the trustees deal with the trust property in a manner that is against their interest or in fraud of their interest, and that the reason they are not permitted to sue is because their right is the same right that the company has, and that when the company fails to prosecute its right until the statute of limitation has run against it, the stockholders can not prosecute the legal ac *477 tion that the company might have prosecuted, for they can not be recognized as having any interest in the property at law, and the only right they obtain to commence the action is one in equity.
That is the action that the company had; and if the company had had no cause of action at law against the directors, and had had only its cause of action in equity, that that action in equity on behalf of the company would not be barred under the statute of limitations, and that is the only action the stockholders have a right to institute for the company, and hence, the statute has not run.
A decision of this question is not important in the case. If the statute of limitations has run against the action that the stockholders have instituted on behalf of the company ■ — >and I mean by this, not that it has run against the legal action, but I mean to consider the matter as though the company never had any legal action, and the directors have instituted the only action that the company ever had. Then if the statute has run against that action, it is not important to determine whether the bar of the company’s action at law would be a bar to its action in equity. This being,true, we will consider, first, the question of whether the plea of the statute of limitations is good as against the action as instituted in this case.
It has been well settled in this state that the relation of the trustees to the corporation and the stockholders is one of trust and confidence, While the corporation owns the property, the directors deal with it as though they possessed it and owned it, and they are held accountable to the company and to the stockholders, as trustees, for the manner in which they deal with the property,
The question as to whether that trust relation is one denominated a continuing and subsisting trust, has never been decided by the supreme court of this state. It is a question upon which the authorities are greatly at variance. There are two schools: One holding that while the duties of the trustees are of a fiduciary character, yet there are so many elements that are contrary to the notions of a continuing and subsisting trust, that they refuse to denominate it as that kind of a trust. While there are other courts which hold that it is a continuing and subsisting trust.
*478 From all the decisions in this state upon the trust relation, we are inclined to hold, and do hold, that it almost necessarily follows that the trust relation is that of a fixed trust. It is not every continuing and subsisting trust that will not come under the statute of limitations.' If the trust is of a nature of a continuing and subsisting trust, and under the articles creating it, or the law creating it, there is given a legal action for the violation of the trust, then, although it is of this nature, the statute of limitations will run from the time that such legal action might have been brought.
Three things are necessary to constitute a trust which will not be subject to the bar of the statute: It must be, first, a direct trust; second, it must be of the kind belonging exclusively to the jurisdiction of a court of equity; and, third, the question must arise between the trustee and the cestui que trust.
Under the second head, it must be of the kind belonging exclusively to the jurisdiction of a court of equity. If any trust — no difference what its nature — does not belong exclusively to a court of equity, than it may be barred.
It is held in this state that an administrator occupies a position of trust and holds the funds of the estate in trust for the benefit of those to whom it is to go; and that in its nature is a continuing and subsisting trust.
But the law gives the ceótui que trust an action at law for a breach of duty on the part of the trustee, and hence the statute of limitations will run against that action at law.
This is equally true if an action in equity is given, especially in this state where all actions at law or in equity are simply civil actions.
It follows that if the plaintiff had a plain and adequate remedy at law or in equity which he might have brought at some particular time for any violation of duty on the part of the trustee,and did not bring that action until it was barred by the statute of limitations, he is cut off from any re-’ covery. And nearly all the courts seem to hold that the only continuing and subsisting trust that may not be barred is one where the cestui que trust has no cause of action that he can bring until such time as the trust is terminated fcy lapse of time.
*479 The weight of authority is that the corporation, or the stockolder for the corporation, has a right of action against the directors whenever they have done any act that is unwarranted by the law, or that is injurious to the property of the corporation, or that is ultra vires.
That being true, the right of action in this case accrued as early as December, 1881, and not being commenced until 1896, the statute of limitations has run and would bar the action,
Suppose that this is not true and that the relation of the directors to the corporation and to the stockholders is a continuing and subsisting trust, then it is true that if at any time the trustees have done any act to destroy the trust property,or to injure the cestui que trust, then a cause of action at once arises on behalf of the cestui que trust which must be prosecuted and against which the statute of limitations will run.
It is the bar to this action growing out of such a trust that bars the trust itself although, strictly speaking, the trust is not barred, but the wrongful execution of the trust or the destruction of the trust property, gives rise to a cause of action which may be barred.
In 1881, the company knew, under the allegations of the petition, that Burke and Hickox had received the money for which the Snow Fork lands were sold. The plaintiff knew it. He made his demands in December, 1881, upon Burke that he be let into the deal, and that he receive his proportion of the funds arising out of the deal.
He was denied, by Burke, any interest in the funds whatever. Not only was he denied, but he was told of an ad-. verse claim. Now it is claimed that this was not sufficient , to revoke the trust.
We believe it to be the law that when a trustee denies the trust to the cestui que trust and claims the trust prop- ' erty by a title independent of the trust and adversely to the claim of the beneficiary, the statute will run in his favor.
At that meeting in New York Burke told Larwill that he had no interest in the property. That was a denial of the trust. And Burke told Larwill that the property, represented by the stock of Wyeth, was in him and Hickox by a *480 title independent of the trust title,and that he was claiming the property adversely to him; and that was sufficient to give rise to a cause of action on the part of Larwill against Burke and Hickox, and which action,if not prosecuted within time, would be barred by the statute of limitations. This action was not commenced within any time required by the various sections of the statute of limitation after that interview, and it is, therefore, barred, and the plaintiff can not recover,
A great many authorities have been cited, showing when the statute will run against a continuing and subsisting trust, in the briefs of the counsel, as well as when it will not. Many of them have been reviewed in our former opinion in this case, and I will not refer to them.
The further consideration of the plaintiff's cause of action against Burke and Hickox we here leave until after we have determined the question between himself and Lee and Hull.
After the organization of the Snow Fork and Cleveland Coal Company in 1874, Lee commenced borrowing money from Larwill, or getting Larwill to discount his paper, with others as sureties thereon, and as these loans were made, Lee placed at different times on different loans a large amount of stock in the Snow Fork Company, belonging to himself and to others, and in this way Larwill became a sort of banker of Lee, and at various times he had large amoun ts of Lee’s and other parties’ notes in his possession to be discounted, and he continued to hold the Snow Fork Stock to be used as collateral whenever a loan was made, and they seemed to specify on the note in each case the amount of stock placed as collateral to that note, and when the notes would become due, Larwill attended to the renewal or he would pay the same off for Lee, often with Lee’s money. In this way we are satisfied that Larwill became possessed of large amounts of notes which had really been paid but never returned to Lee, and Lee so testifies.
This mode of business continued until perhaps 1877.
In April, 1877, Lee borrowed from Larwill $12,357, and he deposited for such loan, collateral 500 shares of his own stock in the Snow Fork Company, which stock Larwill already had in his possession and had held on a previous loan, and he deposited 400 shares of Hull’s stock in the *481 Snow Fork Company. That made 900 shares. Larwill had stock that had been pledged on a loan made by Mrs. Miller, of 550 shares of Lee’s stock in the same company. And Larwill held 300 shares; and on another loan Mrs. Miller held 250 shares, and also 150 shares. And on the Jones and Lee note of $^,000, this 150 shares was held. And as near as we can figure the matter out, Larwill and Mrs. Miller held, as collateral to their loans, 1,600 shares, The only account kept between Lee and Larwill as to these loans and payments made and stock put up, was kept by Lee. That was commenced about the 17th of April, 1877, at the making of the loan of |12,357. That was kept by Miller who is now dead. That seems to be the only account kept between them. There is evidence tending to show, and we believe does show, that Larwili as well as Lee had access to these books and from-time to time examined the account to see how it stood. The books of account only showed one settlement between Lee and Larwill of their financial transactions. That one is on the 10th of October, 1877, There was then, on th.at statement, found due to Larwill from Lee, the sum of 1373.85. Lee gave his check to Larwill to balance the account, and Larwill at that time agreed to return to Lee all his collateral stock in the Snow Fork Company held by him, and he said it was at his home and he would send it down.
After this settlement Lee and Larwill were involved in business of the Bessemer Company, thp Hocking Iron Company and the Buchtel Iron Company; and these companies being afterwards consolidated into the Standard Coal ¿Iron Company, and that company was afterwards reorganized.
Lee was in the east most of the time, and Larwill was at home still acting as a sort of broker or banker for Lee, if-he was not personally interested with Lee in their dealings. And the result of all those dealings was that the Standard Company finally went into the hands of a receiver, and its business was wound up through the courts
About the year 1883, the company undertook to reorganize and compromise with its creditors. It was then found that the acceptances cashed for Lee and Brooks by *482 Larwill, of which there was still outstanding and paid by Larwill $145,000.
They then made an agreement of settlement wherein J. Henry Brooks and W. D. Lee, of Newark, Ohio, acknowledged their indebtedness to Larwill in the sum of $145,000, exclusive of interest, which was paid in transactions of said Lee and Brooks, and fpr them by Larwill, and that it all related to the properties owned and held by the Standard Coal &. Iron Company, Then it recited that Larwill held two judgments against Lee: one in Richland county, and one in Delaware county, each for about $10,000 and some interest. And the contract recites that it was for the interest of Lee that Larwill should join the other creditors of the Standard Coal Company in the contract then being made by them with D. N. Stanton and Thomas F. Mason of New York, whereby it was proposed that such creditors shall accept the first mortgage bonds of the Standard Coal & Iron Company in payment for their claims against said Lee and Brooks growing out of the transactions whereby the properties of said company were acquired; and Brooks and Lee turned over to Larwill their entire claim against the said Iron Company. Larwill became one of its creditors. . The consideration was the cancellation of all the debts that Lee and Brooks, or Lee, owed to Larwill, including the judgments referred to
It was provided that the judgments should continue to remain a lien upon the property as a further security; and when any part of them was collected under such lien, a prorata amount of the Donds was to be given over to Lee by Larwill.
Lee testifies that this was a complete settlement of all matters and things between him aud Larwill, and the contract would seem to warrant such a conclusion. And we find it a fact in this case that that settlement did adjust all matters between Lee and Larwill,
But it is said that although this claim that was due from the Iron Company to Lee and Brooks was turned over to Larwill and he accepted the same and must have signed the composition agreement that was entered into by the creditors of the company, yet he says now, because he did not get the bonds that he was to have, that the claim turned over to him *483 will not act as a payment any further than he received money upon it. In other words, his claim is that the contract was never completed; that there was never a delivery under it, and he gives Lee credit for $25,000 that he got from the receiver of the company when the affairs of the company were closed up, and he claims the balance is due him.
But as we read this contract of agreement, what Lee and Brooks turned over to him was their account against the Iron Company. That was delivered and accepted by Larwill. And what Larwill was to do thereafter, and what he agreed to do thereafter, after that settlement was completed, was that he would scale with other creditors and accept the bonds of the Iron Company in place of his claim.
If this view of this matter is the correct one, which we believe it is, then the contract was all completed at the time that the accounts of Lee and Brooks against the Iron Company was turned over to Larwill, and all that remained to be done in regard to that matter was something that Larwill was to do himself and had agreed to do, not as a part of the transaction as warranted by Lee, but simply a part that he was to do as a creditor of the company.
Then, too, Larwill never repudiated the matter in any manner whatever. He held on to these claims, presented them and received his percentage upon them.
We find that this contract of agreement settled all matters between Lee and Larwill, and that any stock that Larwill had received from Lee should then have been returned to Lee, and that includes the stocks in controversy between them in this suit, and Larwill is not the owner of any stock that was issued to Lee.
Hull loaned Lee 400 shares of stock which Lee put up as collateral on a loan made to him from Larwill. This loan parties now agree was afterwards paid,and Larwill repeatedly promised Hull that he would return the stock to Lee that Lee might return it to Hull. This stock never was returned to Hull, nor was it ever returned to Lee by Larwill, and it is a part of the stock now in controversy between Larwill and Hull, and the stock belongs to Hull,and not to Larwill.
I refer now to the question of the trust as set up in the petition and the cross-petitions.
*484 This action is really not brought on behalf of the company, but it brought by the plaintiff and Lee and Hull to recover their proportion of the money realized from the lands of the Snow Fork & Cleveland Coal Company.
The first amended petition set up the fact that all the stockholders but Larwill had been paid their proportion of this fund, and that he had not been paid, and asked that Burke and Hickox be required to account to him for his proportion of the fund. That averment was omitted in the second amended petition; and it, therefore, became necessary to take testimony upon that question, and the testimony amounts to this: Burke and Hickox received that amount of money going to the stockholders of the Snow Fork Company, computing the sale at $150 an acre. So much of the stock belonging to Lee éfnd Hull and Nutter and Mahollan and others had been pledged at different places as collateral security, and it being uncertain just what stock was owned as represented on the books of the company, they undertook in paying off the different stockholders, to require the stockholders to turn in their stock to Burke and Hickox so that they might have the certificates of stock and a full receipt from the person who was the stockholder by the books of the company. But this was only a method of paying off the stockholders, and was evidently done in order to avoid paying those who were not entitled to the money; and, in this way, they got in all the stock of the company where there was no question as to the title of the stock and no question as to who was entitled to the money. And it proceeded as though Burke and Hickox were buying the stock, which was not. in fact,- or substance, a purchase of the stock; for they did not purchase at any market valúe that it would have, but they purchased at the value that- it would have under the division of the fund at $150 an acre for the land.
That left outstanding as unpaid, simply the stock of Wyeth, of Lee and Hull, of Nutter, Mahollan,and,perhaps, one or two others.
We feel, therefore, justified in bolding that the stockholders have all been settled with except Lee and Hull and Larwill and Nutter and one or two others, the ownership of whose stock was in dispute.
*485 The directors, Burke and Hickox, received this money, $150 an acre, for the Snow Fork lands, not for themselves, but for the company, and they so treated it as the company’s money,and paid it out to those who were entitled to it, and now stand ready to pay to any others who may establish a clear title to their stock; if not barred.
This action, then, amounts to nothing more than a suit on behalf of Larwill and Lee and Hull to recover their proportion of the money for the Snow Fork lands sold, and, in addition to that, establishing in equity or by means of an equitable action their title to the stock,
There was no formal proceeding taken by the corporation to declare a dividend of the amount of money realized for the lands, nor to settle the amounts paid out by the trustee for debts and obligations existing against the company, But this action must have been taken by the' directors who held this money for the company and never held it adversely to the company, but in all they did recognized themselves as holding it and paying it out for the company so far as it has been paid. And the fact of distribution of the proceeds of the land among all the stockholders except those whose stock is in dispute, is equivalent to declaring a dividend subject only to any deductions that may be made from the full amount realized at $150 per acre for any obligations standing against the company. It is equivalent to a dividend declared; and a dividend, while usually applied to the distribution of the profits among the stockholders, is equally applicable to a distribution of a part or the whole of the capital of the company. And the plaintiff, had he had his rights to the stock settled and determined before bringing the action for his money,might have sued Burke and Hickox for his proportion the same as any stockholder can sue the company for his proportion of the assets to be distributed, and he would have had a right, in bringing such action and prosecuting it, to have treated Burke and Hickox as holding the money,for the purpose of paying what was due upon the stock in question, If he had this right of action at law or in equity under the statutes of Ohio wherein the limitations apply to every civil action, the statute of limitations would apply to an action of that cháracter.
As long as Burke and Hickox were paying out this money *486 lawfully to the persons to whom it belonged, it would be useless for the company to claim the money from them, for after receiving it, it would call upon them to distribute the same, and the mere formality on páying it over to the company or to the treasurer of the company, and they paying out the same by way of dividends would be a mere difference in form, and not in substance.
Notwithstanding this right on behalf of the claimants now in court upon this fund, if they had commenced in time to prosecute their action, we are not prepared to say that they might-not have prosecuted it against Burke and Hickox as trustees holding this money in trust for them. All we intend to say is, that they, having a right of action to obtain the money by civil action and the statute having run against that civil action before this suit was commenced, the statute would be a bar.
And even if this is not so, and the trust governing the relation between them is of the nature claimed, still when all right of recovery was denied to Larwill, and when it was denied to him that he had any right or interest in this fund whatever,or that he was a stockholder in the company, there was such a revoking of the trust that the statute would then commence to run, and he could not recover.
If what was done by Burke and Hickox by way of paying the stockholders of the Snow Fork Company, was equivalent to declaring a dividend, then the amount of that dividend going to Larwill was due and payable as soon as he was denibd any interest in the fund, when he was told tha he was not a cestui que trust, and his right of action to recover the same was due and accrued when he claimed his interest in the fund and was denied the same; or, in other words, when he claimed his share of the dividend and was told that he had no interest in the fund whatever.
Hull and Lee never made any demand upon the company, nor upon Burke and Hickox for their proportion of the fund in litigation. And it is a rule of law that until there has been a demand and a refusal, there is no running of the statute of limitations; that the declaration of a dividend creates a debt of the corporation in favor of the stockholders, and that is a debt payable only on demand, and, until there has been a demand, there is nothing due. They never *487 having made any demand until the bringing of this action, which may be treated as a demand, the statute, as to them, has not run
It is, claimed that the plaintiff can have no • standing in court to bring this action because he is not a stockholder of record, He held certificates of stock endorsed in blank to him, which would give him the right to present them and have certificates of stock issued to him and thus become a stockholder of record if his'certificates had not all been in dispute by other parties.
The plaintiff claims, on the other hand, that all he needs to bring this action is to be an equitable owner of stock. That he claimed to be when he brought the action.
There are many decisions both ways upon his question. But when we take into consideration the provisions of opr code, that the real party in interest must bring the suit, and that in whatever form the party’,s title may be, if he has an interest, the code undertakes to provide a way in which he may protect that interest, we are in harmony with the provisions of the code in holding with the courts that say that he is entitled to bring the action.
The question that I left undecided as to whether a stockholder’s action,brought on behalf of the company,is barred if the company would be barred from bringing the action, is not material, inasmuch as we find the company had no action to bring, and' the stockholders had an action and a right to bring it strictly against the directors for their proportion of the fund in the hands of Burke and Hickox, for division. They (Burke and Hickox), acted as the company, and may be so treated.
It was proper to bring the action against Burke and Hickox and also against the company as the prime mover in making a distribution among the stockholders of the assets of the company,as the company and directors iq doing that, acted simply as the agents of the corporation, or as the corporation. But, as we have already said, whether the company does it by resolutions and by board meetings, or the stockholders who were in control as directors of the company, it is simply a difference in form, but not in substance.
Nutter is not máde a party to this action, and gs to any stock and any question that may exist between him and Larwill, we cannot adjudicate.
Henderon & Quail-, Dickey, Brewer & McGowan, for Plaintiff.
Burke & Ingersolls, II. H. Poppleton, for Defendants.
There are other minor questions involved in the pleadings, upon which there is no contest and which we leave to be determined in the decree, according to the present understanding and arrangement of the parties between themselves.
It seems that Mahollan holds stock in the company, and that he is indebted of Burke and Hickox, and that some arrangement has been made beween them for the adjustment of that matter, if it has not already been adjusted between them.
The decree in this case may be drawn according to the counclusions we have reached in this opinion.