### STRAMAN V. NORTH BALTIMORE WATERWORKS CO. ET AL.

1. ISSUE OF STOCK FOR A NOMINAL CONSIDERATION TO STOCKHOLDER IS VOID.

An issue of treasury stock by the directors of the corporation to one of their number, for the nominal consideration of one dollar is void.

2. A STOCKHOLDERS' PETITION ASKING FOR A RECEIVER, BUT NOT ASKING FOR A DISSOLUTION WILL BE REFUSED.

A stockholders' petition for a receiver of the corporation, and that he proceed to collect unpaid assessments, but not asking dissolution or winding up, where the directors are endeavoring in good faith to carry on the business, though they have committed illegal acts, will be refused.

HAYNES, J. (orally).

This is a petition for a receiver and an injunction. We have examined this case very carefully, and perhaps a statement of the facts in relation to it may be necessary in order to enable us to state our views upon them.

It appears that in 1890, or early in 1891, certain parties obtained from the village of North Baltimore, Wood county, Ohio, a franchise to erect and construct and operate a waterworks plant, and the village entered into a contract with them whereby, on the waterworks being put into operation, the village was to pay a certain rental. These parties took some steps towards the consummation of the project, and entered into some contracts, and, I think, had made arrangements to borrow money from the North Baltimore Bank, but of this I am not certain. Finally, in September, 1891, or about that time, they found themselves unable to proceed. At that time steps had been taken for the purpose of forming The North Baltimore Waterworks Company, and articles of incorporation having been filed, stock-books having been opened, and a certain amount of stock having been subscribed for, they proceeded to elect directors of the company as provided for by the statute, and at a regular meeting elected seven directors. The directors immediately organized and elected a president and other officers, who entered into a contract with The South Pittsburg Pipe Works, through George E. Downing, its president, for the furnishing of certain pipe. The first thing, however, that was done by the company was to make provision that the amount that was to be paid yearly by the village of North Baltimore, $3,375.00 per annum for a certain number of hydrants, should be applied on the payment of interest on bonds to be issued by the North Baltimore Waterworks Company, and at the same time they set aside 400 shares of the unsubscribed stock as "treasury stock," which was only to be sold for the betterment and improvement of the waterworks plant. Then W. S. Coon & Son, in consideration of one dollar, transferred all their rights in and to the franchise mentioned to The North Baltimore Waterworks Company, and the company accepted the same. Next in order, the board of directors of the Waterworks Company duly proceeded to provide for the issue of 112 mortgage bonds of $500.00 each, bearing six per cent. interest, payable in thirty years, with privilege of paying in twenty years.

The next in order was a contract which was authorized to be entered into, and was entered into, with the South Pittsburg Pipe Works, wherein they were to furnish iron pipe to the amount of fifteen thousand dollars, eleven thousand dollars worth of which had been delivered to the former projectors, and which has been returned to the possession of The South Pittsburg Pipe Works. It was provided that payment should be made for the pipe that was already on the ground by giving a promissory note to the pipe works company at four months, payable at the North Baltimore Bank, and for all the balance of pipe that should

be delivered it was provided that the note of the company should be issued, payable the same as the other note. It was further provided that The South Pittsburg Pipe Works should indorse the notes of the waterworks company to the First National Bank of North Baltimore to an amount not to exceed ten thousand dollars, the notes to be given at such times as should be required by the waterworks company for the purpose of carrying on the project of building the waterworks plant, the money to be deposited with Levi Wooster and to be paid out by him. It was further provided that $35,000.00 of the mortgage bonds should be placed with Levi Wooster for the benefit of, and really as security for, the pipe works company, and providing that the waterworks company should not issue more than $56,000.00 of bonds in all. It was further agreed that the pipe works company was to use its influence and help sell those bonds, and the waterworks company was to do what it could to sell those bonds, and the proceeds, if they were sold, were to be applied to the amount that was due to the pipe works, and finally it was agreed that any amount remaining due to the pipe works after the bonds were sold was to be paid by the water company; so that the pipe works company held notes of the water company for $15,000.00, with this arrangement of bonds as security, and the further agreement that if the bonds did not sell for enough to pay the notes that the balance was to be paid by the waterworks company.

The waterworks company appointed an engineer, or superintendent of works who proceeded to superintend the construction of the plant. Soon after that they entered into a contract with W. S. Coon and C. E. Coon, whereby Coon & Son were to construct the plant in a workmanlike manner for the sum of $42,000.00, and they further agreed to give to Coon & Son a profit of $2,000, and they also had an agreement with them in relation to certain bonds of the company that were to be held and applied on this work as they were sold, with the proviso that if they fell short, that the company was liable for the $42,000.00. The contract also provided that the waterworks company might buy material, and for such material so bought and which was used by Coon & Son, the waterworks company should have credit on the $42,000.00 contract price, and it seems from the evidence that the waterworks company did so purchase or become bound for substantially all the material that went into the plant, so that on final completion of the work there was little due to Coon & Son upon the $42,000.00 after the proper credits had been made to the waterworks company for material. T..e waterworks were finished early in June, 1892.

On the 28th of May, 1892, a resolution was passed by the board of directors at a meeting held, first appointing a party who should have charge of the waterworks, and then Allen Smalley offered the following resolution: "Be it resolved by the board of directors of The North Baltimore Waterworks Company that in consideration of the assignment to said company of the franchise for the construction and operation of waterworks in the village of North Baltimore, Ohio, and for money advanced, labor expended, material furnished and skill employed, resulting in the completion of said waterworks to the acceptance of the council of said village, the stock heretofore subscribed is authorized to be issued."

Originally, at the time of the organization of the company, Allen Smalley subscribed for 115 shares of the stock; M. A. Smalley subscribed for 115 shares; John J. Geghan, 118 shares; W. S. Coon subscribed for 400 shares, but it was changed to 200 shares; C. E. Coon, 50 shares; Aaron Barnd, 1 share; and A. G. Henry, 1 share. Of "treasury stock" there was reserved four hundred shares.

After the passage of this resolution early in June the stock was issued to the parties in the amounts they each subscribed for, and they became the holders of it. Thereupon matters seem to have run along until the 2nd of September, 1892 which was the time of the annual meeting of the stockholders. In the meanwhile Smalley had disposed of part of his stock as follows: C. N. Haskell, 5 shares, who still holds the stock; John H. Straman, 10 shares, who still holds the stock. Allen Smalley had disposed of to Lillie E. Haskell 5 shares; to S. P.

Harrison, 4 shares; to George Fritz, 2 shares; to J. P. Bailey, 1 share; to W. W. Sutton, 1 share, and to S. L. Bechtel, 2 shares. And those are the portions of stock, so far as the plaintiff is concerned, as are now owned by him, and on which he bases his suit; he having ten shares of stock.

This stock has never been transferred. It was sold to Haskell and Straman, but was never transferred on the books of the company.

On the 2nd of September, 1892, the stockholders had a meeting at their place of meeting at North Baltimore, and at that meeting there was elected as president W. S. Coon, as secretary and treasurer, John J. Geghan, and as directors, Allen Smalley, M. A. Smalley, S. P. Harrison, S. L. Becntel, C. N. Haskell, C. E. Coon, who became from that time on the acting directors of the company.

That stockholders' meeting adjourned to meet later, and on the same day the board of directors had their meeting, following the meeting of the stockholders, at the usual place of meeting, and S. P. Harrison was chosen chairman and J. J. Geghan temporary secretary. Allen Smalley was then elected president; Coon, vice-president; John J. Geghan, secretary, and S. L. Bechtel, treasurer; and then, on motion, the directors' meeting recessed until September 3rd, at 10 a. m. This record recites that the roll being called, all of the directors were present and answered their names to the roll call. On the 3rd of September the board met in special session on this recess that was had on the 2nd, and at that meeting there was present Allen Smalley, S. L. Bechtel, M. A. Smalley, W. S. Coon, S. P. Harrison and John J. Geghan. Thereupon M. A. Smalley tendered his resignation as director and A. G. Henry was elected in his stead, S. L. Bechtel tendered his resignation as director and George E. Downing was elected in his stead; John J. Geghan tendered his resignation as director and scretary, which was accepted, and A. D. Downing was elected a director and secretary and treasurer of the company. Smalley tendered his resignation, and George E. Downing was elected president of the company, and Levi Wooster was elected director and vice-president of the company. After the retirement of Allen Smalley from the chair George E. Downing occupied the chair as president.

Now it is shown that Smalley, as we understand, on this date had transferred of his stock to George E. Downing 100 shares, and John J. Geghan had disposed to Geo. E. Downing 45 shares; to S. P. Bacon, 45 shares; to A. D. Downing, 5 shares; to Levi Wooster, 5 shares; to S. P. Harrison, 5 shares and retained 16 shares. W. S. Coon, who originally held 200 shares, transferred to Levi Wooster 5 shares, and to S. P. Harrison 4 shares, and retained 191 shares. George E. Downing had obtained by transfer 145 shares of stock, which had originally been issued to these first parties in the manner I have stated. Upon Mr. Downing taking the chair occupied and vacated by President Smalley, S. P. Harrison offered the following resolution, viz.:

"Resolved, That the resolution passed September 1, 1891, by the board of directors of The North Baltimore Waterworks Company, setting aside and reserving four hundred shares of the capital stock of said company as a 'treasury stock,' be and the same hereby is repealed." That resolution was voted upon, the following directors voting "yea" as their names were called: W. S. Coon, S. P. Harrison, A. G. Henry, George E. Downing, Levi Wooster—the resolution having received a two-thirds vote in favor of its adoption. Mr. Harrison then offered the following resolution, viz.:

"Resolved, By the board of directors of The North Baltimore Waterworks Company that for and in consideration of one dollar and other valuable considerations paid by George E. Downing to said waterworks company, the receipt of which is hereby acknowledged, the president and secretary of The North Baltimore Waterworks Company are hereby authorized to issue to the said George E. Downing two hundred and fifty shares of the capital stock of The North Baltimore Waterworks Company." That resolution was unanimously adopted

by the following vote: W. S. Coon, L. Wooster, A. G. Henry, S. P. Harrison, George E. Downing, all voting "yea."

On the 29th of September, 1892, the adjourned meeting of the stockholders was held, the following stock being represented: W. S. Coon, 200 shares; George E. Downing, 390 shares; S. P. Harrison, 10 shares, and A. D. Downing, 5 shares, and the following resolution was adopted by unanimous vote: "Resolved, That the acts of the board of directors, at their meeting held September 3, 1892, are hereby approved by the stockholders of this meeting."

It will be observed there was present at that meeting 200 shares of stock represented by Coon, 10 shares by S. P. Harrison and 5 shares by A. D. Downing, making 215 shares by these three parties, and 319 shares being represented by George E. Downing—and at this point I may as well say that, in the opinion of the court, the issuing of that stock, that 250 shares of "treasury stock" to George E. Downing, it appearing from the testimony that no consideration was paid for it other than one dollar, was illegal and unlawful, and not obligatory upon the company; that the stock should be treated as void stock, or returned to the company by the party holding it. The effect of this resolution was to give George E. Downing 250 shares of stock, and he voted this same stock in approval of his act. We think that under the law he could not vote on the issue of the stock to himself, and the same must be held as void.

Mr. S. P. Bacon is not a party to this action, and Downing appears to have issued some of that stock to him, but he not being a party to the suit, our decree cannot affect him.

Now, coming back to the situation of the company at this time.

It appears by the report of the master that the assets of the company were at this time as follows, viz.:

In the hands of Levi Wooster...................$946 21
Due from the First National Bank for water rentals.. 11 50
Water rentals due from different individuals........ 55 00
Due from the B. & O. R. R. for water rentals........ 300 00

It was found that the company owed:

To the Bourbon Cooper & Brass Works........$ 3,480 64
To the South Pittsburg Pipe Works............ 16,682 42
Bills payable account ...................... 17,584 48
The First National Bank of North Balto., Ohio.... 10,839 98
W. S. Coon & Co., balance on account.......... 861 21
H. Marigold, balance on account................ 380 31
George E. Downing, money loaned.............. 885 50
John J. Geghan, services as secretary.......... 375 00

The bills payable that I have mentioned are as follows:

The First National Bank of Chardon.............$5,000 00
The Mansfield Machine Works.................. 5,744 25
Laidlaw & Dunn, two notes, $1,793.45 each...... 3,588 90
South Pittsburg Pipe Works.................... 1,411 56
Mansfield Machine Works .................... 1,485 56

I should say that most of this was due in September, 1892; all, perhaps, with the exception of the note due the bank of Chardon. The testimony shows that while the recital in the resolution passed by the directors in May is, that in consideration of certain money, franchise and services, the stock subscribed for should be issued to the subscribers, that, as a matter of fact, there never was a single penny paid on the stock that was so first issued. It is possible that W. S. Coon, in working out his contract, may have given a certain consideration, but we have been unable to trace it.

Now, then, on September 2, 1892, we have this condition of affairs: With this stock issued to the amount of $60,000, without anything having been paid for it, we have the plant finished; we have the company owing more than the

Straman v. Waterworks Co. et al.

cost price of the plant to persons who had furnished material for the erection and building and putting in operation the plant; and that amount unpaid. So that all there was here was the plant and the amount that was owing to the creditors. The creditors were the real parties in interest, and they were entitled, under the statute, to have a lien on the plant itself, because it would seem from the course of the business that the purchases of material were actually made by the waterworks company, although Coon & Son put it in place. Laying aside the issue of the 250 shares of stock to George E. Downing, which we have set aside, we find that Downing is elected president of the waterworks company and the board of directors with him, and what they would proceed to do, of course we do not know. They assume, in their answer, that if they had not been enjoined they would have tried to pay off the notes of the company by going on with the business; but at this point, or soon after, the plaintiff files a petition in this cause (which was filed October 17), setting up the ten shares of stock that he has obtained, and making some of these other parties who had received stock from the same source defendants; in all representing about twenty-five shares of the Smalley stock, and setting up that the shares so held is paid-up stock. He files his petition to enjoin the doing of certain things: the issuing of this 250 shares of stock to George E. Downing. He asks for the appointment of a receiver. He does not ask for the sale of the works, but that the receiver proceed to assess the stock other than the stock that is held by him—the face value of the stock, and that the proceeds shall be applied on the indebtedness incurred in erecting the plant at the time; that is to say, he asks that the stock held by George E. Downing, who has a large holding, and some of those other parties who have smaller sums, shall be assessed for this amount, to wit: the face of the stock, the object and purpose being, so far as that money will go, to pay the amount that is owing upon the plant, and render the plaintiff's stock, his ten shares of value.

We have endeavored to discuss this matter very fully and look at it in all its aspects, and we are very clearly of the opinion that this plaintiff has no equity or standing in court for the purpose of the appointment of a receiver. He has by purchase become the equitable owner of certain stock. The stock has not been transferred to him. It is claimed by plaintiff that he has made an effort to have it transferred, but could not get it transferred on the books while the agents of the company say they have always been willing to transfer it to him. But, under the law of the land, he is entitled in equity to protection, so far as it concerns his rights and his stock. It does not appear from the evidence that he has paid much money for his twenty-five hundred dollars' worth of stock. So far as some of it is concerned, it has been paid for in services, but this stock that is held by the plaintiff, John H. Straman, is mainly the stock that was taken by Allen Smalley, upon which the company has never received a dollar. Whatever has been paid for it by the plaintiff has been paid to Smalley under some contract or arrangement between him and Smalley.

Upon this state of facts, what are the equities of this plaintiff as against these other parties? What is his standing? He says he has bought this stock and is entitled to be treated as if it was paid up. But Downing received some of the same stock—at any rate he has 145 shares of it, and we are unable to see why he does not stand in the same position as this plaintiff and entitled to the same protection as the plaintiff. We do not see why, if they attempted to make an assessment, he would not have the same defense as the plaintiff, and why his equities are not equal with those of the plaintiff in this matter. And we do not see under the relation that these parties sustain to the company where there is any equity for the plaintiff to ask that these other parties shall be assessed to pay up the debts of the company and make this stock that he holds of face value. We have considered the question of the appointment of a receiver and the right of a stockholder to have the plant put in the hands of a receiver and sold. The matter is very well stated in the case cited in I. O. C. D., 618, C., H. & D. Ry. Co. v. Duckworth. We think when a man comes into a corporation he comes in

to be ruled by the majority, and so long as the company acts for the purposes for which it was organized, the majority is the ruling body. He submits to be ruled by a majority; he concedes that the company shall be controlled and governed by the majority. Section 3248, R. S., provides: "The corporate powers, business and property of corporations formed under this title must be exercised, conducted and controlled by the board of directors, or, where there is no capital stock, by the board of trustees; a majority of the directors must be citizens of the state," etc.

So that this plaintiff and the others in interest with him held their stock subject to the right of the stockholders to elect a board of directors, and subject to the right of those directors to proceed to do acts within the limitations of the powers of the corporation; if they pass beyond the corporate power, then the right remains in the stockholders to have them restrained. But the stockholder has not the right upon a difference of opinion as to the manner of conducting the business to ask and have a receiver appointed.

It is said also in works on Stock and Stockholders that the stockholders, under certain circumstances, may ask to have the affairs of the corporation wound up; but there is no prayer here to wind up the affairs of this company. The legislature has provided how and when a corporation may be wound up. When a majority of the directors of a corporation, or when the directors do not do it, then a majority of the stockholders representing not less than one-third of the capital stock of the corporation—the paid-up stock—under certain conditions desire to have the corporation dissolved, they may file a petition in court to have it wound up; a receiver is appointed and he collects the amount that is unpaid, and generally winds up the affairs of the corporation.

Objection is taken here to the fact that these bonds have been issued by the company. They have been issued and were issued by a full vote of the board of directors, and were issued among the very first things that were done by this corporation, and a year before George E. Downing became a stockholder in the corporation, and a certain amount of the bonds were issued and pledged to the pipe works for the payment of the amount of property that was sold to the water-works company, and the pipe works have an interest in those to that extent. The directors had authority to issue those bonds, and whether to issue bonds or make assessments, may be left to the discretion of the directors. Whether the company shall proceed to collect assessments to pay debts; whether, instead, it shall issue bonds to raise money to pay debts to carry on the business, or whether it shall float its debts until money can be raised from its income to pay debts, are questions for the directors to determine.

It is claimed here, and urged very vigorously, that Downing was in the company for the protection of the pipe works. The pipe works have an equity here. In fact, if the creditors of this company have not an equity in this plant, we do not know who has, as we do not see that any one else put any money into it, and as long as Downing, as a director and president of this company, proceeds by regular steps to carry on that plant and to raise money for the purpose of paying off the indebtedness of the company, so long he is doing what he has a perfect right to do.

We know of no power that will compel the officers of this company to go on and say that they will do certain things, or run certain risks, or incur certain liabilities.

We know of no authority whereby we can compel the directors to go on and say they shall collect in those amounts from the various stockholders, including the plaintiff, and pay off these debts.

If the debts are not provided for, then the creditors have rights the court will protect, and may appoint a receiver, collect the amount on unpaid stock and enforce stockholders' liability, etc.

We are asked to make an order cancelling these bonds, but we do not see any equity in that. Some of these bonds were pledged to creditors of the com-

pany, and the bonds unpledged may be sold for the purpose of paying the indebt-edness of the company.

It is claimed by counsel that the Pipe Works Company agreed to take these bonds in payment of their account, but the record is contrary to that. The Pipe Works holds those bonds purely as collateral. We have no question that if the company is unable to sell those bonds that the Pipe Works has the right to enforce its claim against the stockholders.

Since the commencement of this suit, the First National Bank of North Baltimore has taken judgment upon the notes that it holds against the company, and has proceeded to enforce its claim by the sale of the property. We have been asked to make that bank a party in this action, and enjoin it from proceeding with the collection of its claim. This matter stands upon oral statements, not upon the evidence.

There is nothing in the petition in regard to the bank, and we think we are not required to make the bank a party, and ought not to do it.

It is proceeding in the regular course of business to enforce its claim, and we think it has a right to do so. If there is any complication arises about the sale of that property, that will be a matter of after-consideration, but as the matter is to-day, we see no reason why we should prevent the bank from collecting its debt.

We therefore see nothing that the plaintiff is entitled to, beyond the enjoining of the two hundred and fifty shares of stock, and beyond that, the prayer of the plaintiff's petition will be refused.

*James & Beverstock* and *Haskell & Sutton*, for plaintiff.

*Frank Taylor* and *J. O. Troup*, for defendants.