**KAHN v. SCHIFF et al.**

Civ. No. 2078.

United States District Court
S. D. Ohio, Columbus.

Jan. 23, 1952.

Gresser & Walker, New York City, Wright, Harlor, Purpus, Morris & Arnold, Columbus, Ohio, Harry Kasfir, J. Louis Warm, Cincinnati, Ohio, for plaintiff.

Herman R. Tingley, James W. Huffman, John Benson, all of Columbus, Ohio, for defendant.

WILKIN, District Judge. (Sitting by designation)

This is an action by a minority stockholder against Shoe Corporation of America, its directors and other individuals. In the first cause of action plaintiff seeks an injunction to restrain the issuance and sale of certain Class B. Stock which she alleges would be unlawful, ultra vires, and in violation of the trust obligation of the directors.

In the second cause of action plaintiff asks a decree declaring that the individual defendants who hold stock of the Waynesboro Shoe Manufacturing Company are trustees of such stock for the Shoe Corporation of America because, she alleges, the purchase of such stock was a "corporate opportunity" of the Shoe Corporation, and was acquired by the defendants in violation of their obligation as officers and employees of Shoe Corporation.

In the third cause of action the plaintiff seeks a decree holding the defendant directors accountable for all loss and damage which Shoe Corporation has suffered from the sale and lease-back of the real estate of Shoe Corporation.

The defendants affirm the legality and good faith of the acts complained of and deny that the plaintiff is entitled to the relief which she seeks. Most of the pertinent facts are set forth in corporate records, correspondence, and stipulations. The crucial issues arise from differences as to the conditions, intentions, and effects attending the acts complained of and as to the law applicable.

### First Cause of Action

In this case, and especially in this first cause of action, the court must consider, first of course, the rights and responsibilities of the parties, but also the effect of its decisions upon corporations generally. A sound public policy toward corporations is necessary—now as never before.

Private corporations are an essential part of the American economic system and have been a prime contributing factor to our material success. They have been the means by which large aggregates of capital could be devoted to industrial development without sacrificing private ownership. They are a compromise between absolute capitalism and complete communism, and supply some of the benefits without the evils of those two extremes. The law governing them must be maintained and developed so as to preserve respect for and confidence in corporations and their management if free enterprise is to survive.

The Shoe Corporation was organized in 1920 under the laws of Ohio. Its principle business was and is the sale of shoes at retail. The management of the company has been successful and its business profitable. It has expanded rapidly, and has taken over other companies and several manufacturing plants.

Prior to November 3, 1947 the authorized capital stock of Shoe Corporation consisted of 500,000 shares of common stock without par value of which 222,750 shares were outstanding, and 50,000 shares of preferred stock, none of which was outstanding. The corporation has been controlled in its policies, practices and management by the Schiff family which owned in excess of 30% of its voting stock. The Schiff family consisted of Robert W. Schiff, his brothers Albert Schiff and Morris Schiff, his nephews Jack Schiff, Saul Schiff, William Schiff and Max Schiff, his son Herbert W. Schiff, his sons-in-law Joseph Blatt, Clifford Levin, Herbert C. Lee, his cousin Edward E. Schiff, his brother-in-law Dr. Louis A. Lurie and other persons related by blood or marriage all of whom were directors, officers or employees, and shareholders of Shoe Corporation.

Robert W. Schiff was one of the organizers of the Corporation and at all times its president and treasurer as well as director. He was the dominating member of the Schiff family and as such controlled the management and business of the corporation. During the period covered by this litigation the Schiff family elected all seven members of the board of directors, at least five of whom were members of the Schiff family, one of the other two being the defendant Tingley, the Corporation's attorney, and the other either a representative of the Corporation's bank or an employee of the Corporation.

In October 1947 the management devised a plan of recapitalization, providing for an increase of its authorized capital stock to consist of 250,000 shares of preferred, $100 par value, and 2,000,000 Class A shares and 600 Class B shares. The outstanding 222,-750 shares of common stock were to be exchanged for 445,500 of Class A. The preferred and Class A stock were to have full voting rights and were jointly entitled to elect seven directors out of a proposed board of twelve. The new Class B stock was to have the same dividend and liquidation rights as the Class A stock and in addition it was to have the sole right to elect five of the board of twelve directors. It would also have such power, voting as a class, as was granted by the Ohio law.

The plan provided that the 600 shares of Class B stock should be issued at a price per share equal to the price of a share of Class A stock on the New York Curb Exchange. The purpose of the plan was to insure the Schiff family power to elect the majority of the Board. While the plan provided that the stock should be issued to employees, officers and directors, it vested in the Board of Directors the authority to designate to whom and in what quantities it should be issued. It was stated that the 600 shares of Class B would be issued to members of the Schiff family as follows:

| | | |
|---|---|---|
| Robert W. Schiff | Pres. & Treasurer | 150 Shares |
| Joseph Blatt | Supervisor | 37½ " |
| Clifford Levin | Do | 37½ " |
| Herbert C. Lee | Employee | 37½ " |
| Herbert H. Schiff | Vice-President | 37½ " |
| Jack Schiff | Do | 100 shares |
| Albert Schiff | Do | 50 " |
| William Schiff | Do | 50 " |

The ownership of 30% of the common stock enabled the Schiff family to elect two directors. Their ownership of Class B stock would enable them to elect five members of the Board, thus giving them the power to choose seven of the twelve directors.

On October 17, 1947 a notice of a special meeting of shareholders to be held on November 3, 1947 in Columbus, Ohio was sent by the Corporation to shareholders, together with a proxy statement setting forth the substance of the proposed plan of recapitalization.

Thereafter the Corporation received letters from shareholders protesting that the proposed plan was illegal and improper and if adopted would result in vesting perpetual control in the Schiff family who were only minority shareholders. The letters demanded that the plan be abandoned and one of the protesting stockholders filed suit in a state court to enjoin the execution of the plan. Thereafter on January 2, 1948 this action was commenced and Judge Mell G. Underwood issued a restraining order against the issuance of any of the Class B stock.

Subsequently the management of the Corporation modified the plan of recapital-

ization so as to provide that the Class B stock could be transferred only to persons who had been actively engaged in the business of the Corporation for at least two years. It was provided also that if a holder of Class B stock wished to sell it, he would have to exchange it for an equal number of Class A shares to be issued by the Corporation, and that thereafter Shoe Corporation could issue the Class B stock to an employee or an officer designated by the Board.

On July 17, 1948 the revised recapitalization plan was submitted to the shareholders at a special meeting held pursuant to a notice and a proxy statement. At such meeting a number of shareholders abstained from voting and a number voted against the proposed amendment. Robert Schiff and Herman R. Tingley were the only persons present in person. As members of the proxy committee they were able to cast the vote of a majority of shares for the proposed plan. In order to make up such majority it was necessary to include the votes of the proposed recipients of the 600 shares of Class B stock.

Amended articles of the Corporation embodying the proposed plan of recapitalization were filed, and by agreement the restraining order of Judge Underwood was continued. The plaintiff, acting for herself and other stockholders, now asks that such restraining order be made perpetual.

There is no need to discuss all the objections and charges of illegality which Plaintiff makes. Even if every procedural step had been taken exactly according to law, a full and frank disclosure of all pertinent facts had been made, and the plan of recapitalization had been approved by a majority of stockholders without counting the shares owned by the Schiffs, and it were conceded that the common stock carried no pre-emptive rights under the charter, still this court would be constrained to hold the proposed plan a violation of the trust obligation which the directors owe to stockholders.

The court in fact finds that the evidence fails to support some of the Plaintiff's charges. The proxy statement was a fair disclosure of the essential parts and provisions of the plan, and the things omitted were not necessary in the circumstances. The evidence fails to reveal any intentional dishonest or deceptive conduct or motives on the part of the officers and directors. It is possible and probable that they confused the Schiff family interests and the shareholders' interests and thought those interests identical. They probably believed they were doing what was best for all. But in fact and in law those interests were not the same. And as between the two groups the obligation of the directors was exclusively to the shareholders. The invalidity of their acts consists of their trying to serve conflicting interests and thus dividing or diverting their fiduciary obligation.

The court can follow the statements and arguments of the Defendants and approve most of them. But when the plan reveals that Class B stock is to be issued at a price fixed by the directors and distributed to officers and employees, and in quantities, according to the discretion of the directors, without uniform rule, or limitation, and the directors propose to issue it to themselves, then the judicial conscience is shocked and the court's approval can proceed no further. It is such a clear violation of that ancient equitable principle which prohibits fiduciaries from trafficking with trust estates to their own advantage, that even the approval of a majority of shareholders can not justify it, as long as there is one shareholder who objects.

The prime obligation of directors is to afford the corporation good management. Good management comes from experience, skill, sound judgment and good character, not from family or other relationship. The history of corporation management shows that it is sound policy to vest the choice of directors in those who own the majority of stock. Majority rule—if not perfect—is the best practical means of obtaining good government in both politics and business. Self-protection and sense of fair play among stockholders can be trusted to sustain good government. It is better to trust that method—in spite of the efforts at times of evil men to usurp power—than to invite

the abuses that flow from arbitrary and absolute control.

Even if it be conceded that the Schiff family management has been good and that the reorganization plan is an honest effort to give security to that management, what assurance can anyone give that it will be good a decade from now? If it should be, the same forces that sustain it now will support it then; and if it is not good then, it ought not be continued. If it should be incompetent or bad, it would be a detriment to the members of the Schiff family as well as to other stockholders.

Attempts to fix arbitrary control in some special group or interest are as a rule not only unfair but unwise. They fail of their purpose even if not restrained by law. The long record of man's efforts to provide for the security and comfort of his progeny and relatives, regardless of their merit, proves such efforts futile. The established order of nature is such that no one can be absolved from individual responsibility for his life. Though men are endowed with a social nature, they are nevertheless responsible for their individual conduct, and neither bounty of ancestor nor any business, economic or social arrangement can save them from the consequences of their failure to meet the requirements of a good and useful life. If by some arbitrary contrivance unworthy men are maintained in office, they are not thereby saved from the consequences of their failure, but the evil consequences are increased and extended to innocent persons. It is sound corporation policy to make management rely for its continuance on its worth.

The chief reason for incorporating a business is to extend its existence beyond the span of human life, and to bring to the management of the business continuity and the combined judgment of several minds. It is sound corporate policy—followed by most successful companies—to draw into the directorate some men who have won respect and confidence in other callings or lines of endeavor. There may be greater harmony and sense of security in a family company, in what is generally called "a close corporation" but there is inherent in such an organization a tendency to deterioration which is similar to the deterioration that comes from what stock-farmers call "in-breeding." There is an immediate comfort in being surrounded by obsequious retainers, but a strong executive, in corporate as in other affairs, will forego that comfort and draw to his administration other strong characters who will not hesitate to question and, if necessary, oppose. Such an administration has a firmer foundation, greater confidence, and in the long run greater security. A family-controlled corporation can hardly be justified except when its stock is held quite exclusively by the family. When the stock is widely distributed, so should be the power of electing directors.

The evidence is quite clear that the actual value of the Class B stock is more than the price fixed for it by the plan. Certainly if the purchasers of the Class B stock went into the market to purchase an amount of stock carrying $5/12$ths of the voting power of the corporation they would have to pay much more than the amount set in the plan. The argument of counsel for the defendants that such stock is being issued in consideration of past and future services cannot be accepted by a court of equity. The court cannot approve such a grant for services already compensated, nor for services which may never be rendered. A grant of corporate property for past services can only be approved in rare instances where justice and fair dealing require it, and no grant for future services is warranted where there is no corresponding obligation to render such services.

There is abundant authority for the fundamental principle upon which the courts' determination of the first cause of action is based. There has been an increasing number of cases that recognize the fiduciary nature of the obligation of directors. There is indeed an apparent extension of the principle and an increasing insistance on its application. One of the clearest and most pertinent statements of the principle as it applies to this case is found in the opinion in the case of Elliott v. Baker, 194 Mass. 518, 523, 80 N.E. 450.

■ The directors of a corporation act in a strictly fiduciary capacity. Their office is one of trust and they are held to the high standard of duty required of trustees. They cannot be permitted so to manage the affairs of their cestui que trust that the system of business corporations, by which so large a part of the world's work is now conducted, "may become a system of frauds". Peabody v. Flint, 6 Allen, Mass., 52, 55; European & North American Railway v. Poor, 59 Me. 277. Corporate directors cannot manipulate the property, of which they have control in a trust relation, primarily with the intent to secure a majority of the stock or of directors in any particular interest. This is not a fair exercise in good faith of the power with which they are clothed. Punt v. Symons, 1903, 2 Ch. 506–515. This is especially true when the issuance of the stock is for the express purpose of retaining in power the very persons who authorize the issue, and who are therefore distinctly benefited to the disadvantage of another and substantial part of their stockholders—Gray v. Portland Bank, 3 Mass. 364.

Counsel for plaintiff may prepare a decree in favor of plaintiff on the first cause of action.

## Second Cause of Action.

■ As to the second cause of action, the evidence fails to support the allegations of the complaint that the purchase of the Waynesboro stock was a "corporate opportunity". The evidence reveals an inability on the part of Shoe Corporation to purchase the Waynesboro stock within the term of the option. Its obligation to its banks forbade such an investment at that time. The directors determined that the corporation could not then safely make such a capital investment, and the conditions and circumstances revealed by the evidence sustain that decision.

At the very time that the Waynesboro stock was being purchased, Robert W. Schiff was negotiating with banks and insurance companies in New York for an increase of long-term loans to meet the urgent needs of Shoe Corporation for additional funds. The Corporation had made heavy capital investments to acquire control of several other shoe companies and a manufacturing plant in Maine. It is well known that banks require their debtors to maintain a certain ratio of current and fixed assets. This ratio was low. It was not a favorable time for sale of stock. The loan negotiations were of vital importance. The officers of Shoe Corporation deemed it unwise to make another capital investment, or even to suggest such a diversion of more current funds, at that crucial time. Their judgment cannot be impugned by the fact that the Waynesboro purchase has been profitable. Nor is it just or equitable for stockholders of Shoe Corporation to ask profits from an investment which it was unable to make.

■ The purchasers of the Waynesboro stock have from the beginning expressed a willingness to sell at a price to Shoe Corporation when it is able to buy. It is within the discretion of the directors of Shoe Corporation to accept the offer if they act in good faith toward the Corporation. The price asked is the sum paid by the purchasers for the stock, plus earnings of the Waynesboro Company during the term of their ownership to time of offer, less dividends received by purchasers, plus interest at 5% on the sum paid by the purchasers, figured from time of offer to completion of sale. This court cannot say as a matter of law that such a price is unjust or inequitable if the earnings are determined by accepting methods of accounting.

The relief prayed for in the second cause of action is therefore denied.

## Third Cause of Action.

As to the third cause of complaint, the court finds from a preponderance of the evidence that the amount paid for the real-estate sold by the Corporation is fair and not less than its actual value, and that the terms of each lease-back are fair and in accordance generally with present business practice.

The sale and lease-back transaction has become such an established practice that books on the subject are now being published for the guidance of lawyers and busi-

nessmen. *(See The Lease As A Financing and Selling Device:* Eiteman & Davisson, Univ. of Michigan Press.) The justification of such practice is found in the fact that current assets in an active and well managed business have a much greater power to contribute to earnings than have fixed assets. It is the "turnover" of capital that brings profits. Assets must therefore be "liquid" to earn dividends. This is especially true of expanding business when capital is scarce. There is a prevalent saying that it is bad practice to have much of a company's capital "in brick and concrete".

Both of the transactions described in the second and third causes of complaint are under the shadow of suspicion which always obtains when corporate directors have interests on both sides of a deal. True, the directors having an immediate relation to the persons for whom the Corporation's real estate was purchased did not vote for the approval of the sale; but because of the more remote relationship of the other directors the apprehension was not entirely removed. This shows why it is best to have some directors on the board who can bring to such problems a judgment so detached and disinterested that it will not be suspected.

But mere suspicion will not warrant a court's interference with an act of directors within their authority and discretion, when the act is not illegal or inequitable and the company has suffered no loss. In this instance the expenditure made for alterations in the Fourth Street building inures to the lessee, and is such as is usually made by the lessee. It benefits the lessor, if at all, only indirectly, and because of the long term of the lease, quite remotely. The expenditure was made to meet the needs of the Corporation, and was a proper exercise of the discretion of the directors. It does not affect the prior sale and lease-back.

The evidence shows no loss to the Corporation and there is no reason to grant the relief prayed for in the third complaint.

Judgment and decree for plaintiff on the first cause of action.

Complaint dismissed as to the second and third causes of action.

Costs, including plaintiff's expenses and reasonable attorneys' and accountant's fees, to be taxed against the defendant Shoe Corporation.