**OHIO DRILL & TOOL COMPANY et al.,**
Plaintiffs,

v.

**Fred H. JOHNSON et al., Defendants.**

**Civ. No. 70–344.**

United States District Court,
S. D. Ohio, E. D.

June 12, 1973.

Laurence E. Sturtz, Brownfield, Kosydar, Bowen, Bally & Sturtz, Columbus, Ohio, for plaintiffs.

Robert W. Newlon, John D. Holschuh, Thomas B. Ridgley, Vorys, Sater, Seymour & Pease, Thomas J. Moyer, Crabbe, Brown, Jones, Potts & Schmidt, Columbus, Ohio, for defendants.

Edward Zink, pro se.

## STATEMENT OF THE CASE

CARL B. RUBIN, District Judge.

This is a stockholder derivative action, brought by The First National Bank of Alliance, Ohio, and one George Sanor, former shareholders in defendant The Fidelity National Life Insurance Company, on behalf and for said company. Plaintiffs, in their amended complaint, allege various violations of federal and state law by eighteen corporate officers and directors, and in consequence of these claimed violations, seek monetary relief.[1] By Order of December 20, 1972, this Court held the action to be properly pleaded as a stockholder derivative suit, and ruled that plaintiff intervenors had standing to bring the action for the interest of the defendant corporation. We further found that the complaint pleaded facts sufficient to warrant exercise of our jurisdiction under Section 10(b) of the Securities & Exchange Act of 1934, 15 U.S.C.A. § 78j, and Rule 10–b–5 promulgated thereunder. Accordingly, all motions to dismiss were overruled and the parties proceeded, on February 6 and 7, 1973, to try their federal and pendant state claims to the Court.

Having carefully considered all documents, exhibits, affidavits, depositions and briefs of law which have been presented to this Court, we now file, pursuant to Rule 52, Fed.R.Civ.P., the following Findings of Fact and Memorandum Opinion of Law.

1. By date of trial, all but three defendants had their claims settled or dismissed. Remaining in the proceedings and appearing before this Court were defendants Fred Johnson, Robert Woodward and Edward Zink, all officers or directors of The Fidelity Corporation. In this action, the injunctive powers of this Court were not invoked; Fidelity, as a corporation, is no longer extant, having been merged into the American Financial Corporation by agreement of August 26, 1971.

## FINDINGS OF FACT

### *The Fortune and CIC transactions*

In the years 1965 and 1966, the Fidelity National Life Insurance Company (Fidelity) and some of its officers and directors sought to expand company insurance operations into adjoining states. Unable to qualify for a license to do business in the state of Pennsylvania, these officers and directors determined to raise capital for, and organize, a new Pennsylvania insurance company, The Fortune National Life Insurance Corporation (Fortune). To facilitate this end, a holding company called Corporation Investment Company (CIC) was formed, so as to allow for the purchase of stock by interested investors in the state of Ohio. Defendants Zink, Johnson and Woodward, each an officer or director of Fidelity, participated in the planning and organization of both Fortune and CIC (R. 10, 11, 15–16, 51).

The promotion of those companies was accomplished in the following manner. Fidelity did not directly invest in Fortune stock because such an investment was prohibited by Ohio law. (R. 291–2). Instead, individual directors of Fidelity and other persons were given an opportunity to acquire Fortune stock through investment in CIC. Initially, the Fidelity Board of Directors authorized investment in CIC of $40,000.00 (R. 17). At a later point in time, it was determined that such an investment was beyond the limits permitted by Ohio law, and the investment was reduced to approximately $34,000.00 (R. 55). Even this reduced investment, however, remained beyond the legal maximum.[2]

Upon the organization of Fortune, 300,000 founders shares were authorized to be sold at $1.50 each, with the intention of later selling shares of the same class to the public at $5.00 each (Plaintiff's exhibit 33, at p. 3; Agreed Statement of Facts). 88,700 of these shares, or 29.5% of the total authorized number, were acquired by CIC, plus 25,000 warrants to purchase stock at $5.00 a share. 21,485 of these 88,700 shares, or 24.2%, were distributed by CIC to Fidelity, in consideration of its investment in the holding company. In addition, individual defendants acquired Fortune founders stock and warrants in the following numbers:

|          | Shares | Warrants |
|----------|--------|----------|
| Johnson  | 20,000 | 50,000   |
| Zink     | 13,333 | 50,000   |
| Woodward | 16,333 | 50,000   |

(Plaintiffs' Exh. 33, p. 10)

The planning and organization of Fortune National required the incursion of various expenses for travel, incorporation, attorney's fees and the lease of office space in Pittsburgh. These expenses were paid in the first instance by Fidelity and subsequently reimbursed by Fortune through special accounts (R. 23–26). The evidence shows that out of pocket costs in the amount of $8,697.36 were expended by Fidelity (joint exhibit No. 1), and repaid in full by Fortune (Defendants' exhibit I–73, attached to joint exhibit 1; R. 116–117). No evidence has been presented of any cash advances made by Fidelity on Fortune's behalf that were not reimbursed.

Although there is a conflict of testimony on this point, Fidelity employees and officers apparently did not bill Fortune for the services on behalf of Fortune on an hourly basis (compare R. 54 with R. 293). However, no evidence has

---

2. O.R.C. § 3907.14(O)(6) provides:

No domestic life insurance company shall, except for investments authorized under divisions (O)(7) and (Q) of this section, at any time have invested a sum exceeding one percent of its admitted assets as of the preceding thirty-first day of December in the bonds, notes, debentures, and stocks of a particular corporation, nor at any time own more than twenty-five percent of the outstanding stock of any corporation;

Fidelity's investment constituted more than 1% of the company's assets ($1,642,987 for the year 1965) and more than 25% of the total investment in CIC ($133,651.00).

been presented by plaintiffs with regard to the number of hours expended or the value of such services.

In February of 1966, the stockholders of CIC voted to dissolve the corporation, and CIC's holdings in Fortune National were redistributed to its original investors (Plaintiffs' exh. 39, R. 19–20). Defendants Zink, Johnson and Woodward, as officers and directors, determined the method of distribution upon liquidation (R. 33). Basically, it was decided that one share of Fortune stock be issued for every investment of $1.50 in the company and 25,000 warrants distributed at a ratio of ten warrants to one share (Plaintiffs' exh. 39). Some exceptions were made to this general plan, however, and due to the existence of "leftover" shares and warrants, certain individuals received more than a proportionate share. Helen Harrington, a secretary and bookkeeper at Fidelity, received five shares of stock and 235 warrants even though she was not an investor. It was testified that this was intended to "compensate" her for the keeping of CIC's books (R. 63–64). Gary Zink, Larry Zink, Richard and Irene Zink, all relatives of defendant Edward Zink, received warrants out of proportion to the shares they owned. Defendants Johnson and Woodward received 2800 warrants and defendant Zink 2000 warrants in addition to those to which they were entitled under their share subscription (R. 39). None of the above distributions were ever authorized at a Board of Directors meeting (R. 65).

The warrants to buy Fortune stock were nontransferable, nondetachable, and apparently seldom, if ever, exercised (R. 246–249). Their value would depend, of course, upon fluctuations of market value during the period of their five year term. Taking into account these considerations, expert testimony established that the value of the warrants in question was approximately $1.25 per warrant (R. 245, et seq.).

Of 415,000 warrants allocated during the organization of Fortune National, CIC received 25,000 (Plaintiffs' exh. 33). Upon the dissolution of CIC, Fidelity received 3,255 of these 25,000 warrants (Plaintiffs' exh. 39). The three defendants in this action together received 8600 warrants to which they were not entitled. Other individuals received a total of 3420 warrants to which they were not entitled. On the basis of its proportionate investment in Fortune, Fidelity was entitled to receive 24.2%, or 2909 of these extra 12,020 warrants. See p. 257, *supra*.

### Amvets Insurance Policy

On November 30, 1967, an association insurance agreement was entered into between Fidelity and defendant Zink regarding an organization known as American Veterans of World War II and Korea (Amvets). Zink, a licensed insurance agent and broker, was the exclusive agent of record of Amvets and by the agreements in question, placed the business in the hands of Fidelity. Zink was also a director of Fidelity and continued to be one until October 27, 1971.

During the period from 1967 to 1971, the Amvets premiums represented a substantial portion of the total premium income of Fidelity (R. 190). Although the Amvets business generated a positive cash flow, taking into account fixed overhead and administrative expenses during its first year of operations, it was in all likelihood not a profitable business.[3] (R. 157–158). Attempts

---

3. There is some disagreement between the parties as to whether the Amvets business was or was not ultimately profitable, a relative loss or profit figure depending upon which of several accounting methods is used. In our view, this question is not of major significance because there is substantial testimony in the record that it is not unusual for group insurance programs, such as Amvets, to lose money during their first years of operation, and further because of evidence in the record that the business was highly desirable, sought after by a number of major insurance companies after Fidelity terminated its contract with Amvets (R. 261–263, 275, 272).

were made during these years to generate profit by revising the contract and by increasing premium rates (R. 191). Nevertheless, administrative problems led to recommendations in 1970 that Fidelity divest itself of the Amvets business and it did so the following year.

No evidence has been presented of any unfair dealings or breach of fiduciary duty by Mr. Zink with regard to the Amvets contract. There is no reason to believe that he placed this business with Fidelity to benefit himself in disregard of its profitability; to the contrary, as a shareholder of Fidelity, he had every reason to hope that the business would be profitable. Nor is there any evidence that he was paid an excessive commission; to the contrary, his contract with Amvets was described during trial as "standard and reasonable," and "very fair" (R. 264, 276).[4] No evidence of any kind has been presented which might justify a finding of personal liability against defendant Zink for losses resulting from the Amvets contract.

### Miscellaneous Stock Sales

For the year 1966, defendant Johnson received from Fidelity as compensation for services rendered, 4300 shares of Fidelity stock, valued at $34,000.00. After the certificates were issued, Mr. Johnson left them at the Fidelity offices and determined to sell them back to Fidelity for $34,000.00 cash. This stock was then sold by Fidelity on the open market through American Securities for $34,000.00, less a ten percent commission, or a net of $30,600.00 (R. 226–227). While this transaction was apparently never disclosed to Fidelity's stockholders, no evidence has been presented that Mr. Johnson received anything more by way of remuneration than he was entitled to. Nor does it appear from the evidence that any person other than the corporation itself realized profit from the open market resale of Fidelity stock.

It is further alleged by plaintiffs that in 1965 and the years following, until his resignation as an officer and director of Fidelity, defendant Woodward made substantial profits by means of short-swing sales (sales of securities held less than six months) of Fidelity stock. There is evidence in the record that Woodward did engage in repeated purchases and sales of Fidelity stock (Plaintiffs' exh. 42). However, he always maintained a large reserve of stock held for more than six months. It is impossible to ascertain from exhibit 42 what amount of stock, if any, was held on a short-term basis. Furthermore, in May of 1970, during a proxy fight, Mr. Woodward gave to the Fidelity Board of Directors an accounting of his Fidelity stock transactions over a two year period, it was determined that a profit of $873.63 had been realized, and payment of such amount was accepted as "a complete release to Mr. Woodward on profits resulting from short swing transactions in shares of the [sic] corporation." (Plaintiffs' exh. 17, Minutes of May 7, 1970). Any further profits to Mr. Woodward have not been adequately proven; and no evidence has been presented which might justify setting aside as self-serving or fraudulent the release agreement in question.

### MacJay Lease

On November 1, 1963, pursuant to authorization by its Board of Directors, Fidelity leased office space at 34 North High Street, Columbus, Ohio, from MacJay Enterprises, Inc. (Plaintiffs' exh. 17). Defendant Johnson, as well as being an officer of Fidelity, was a one-half owner and director of MacJay at the time of the drawing of the lease. MacJay Corporation did not own the premises at 34 North High Street, but leased them in turn from the "34" corporation; thus, MacJay's arrangement with Fidelity was in the nature of a sublease.

---

4. Upon subsequently placing the Amvets business with The Continental Casualty Insurance Company in 1971, Mr. Zink received the same commission but a greater allowance for expenses than he received from Fidelity.

MacJay paid rent for these offices to the "34" corporation in the amount of $2093.33 per month. In turn, it charged Fidelity $1050.00 per month for use of 3400 square feet of space and another subtenant $1166.66 per month, thereby netting a profit to itself of $133.33 per month on the sublease (Plaintiffs' exhibits 3, 4 and 5; R. 220). Half of this monthly profit, it may be assumed, was realized by Mr. Johnson, apparently without the knowledge of the directors. The contract term of the sublease was five years, but, because of increased business activities, Fidelity acquired new office space after four years, in late October of 1967, and thereafter moved out of the premises at 34 North High Street. It is not clear from the evidence whether or not Fidelity was held to its obligations on the remaining year of the lease.

### Professional Investors Transaction

On December 30, 1970, Fidelity National, at the request of the defendants in this case and company accountants, entered into a seven year bulk reinsurance agreement with the Professional Investors Life Insurance Company (Plaintiffs' exh. 23). By this contract it was agreed that, annually, a block of business with total reserves of $800,000.00 would be coinsured on a 50–50 basis by the two companies, that Fidelity would receive a reserve credit and that Professional Investors would assume the reserves. The purpose of the agreement was to enable Fidelity to reduce its yearly reserve increase by $400,000.00 and thereby to show on its books a net operational gain in that amount. Professional Investors' fee for this transaction was to be 12% annually of the amount of reserves released, or $48,000.00, plus a risk premium for mortality risk assumed, estimated at $10,000.00 to $15,000.00 annually (Plaintiffs' exh. 11, at 15).

Although it was testified that reinsurance agreements are not by themselves unusual, this particular contract was speedily negotiated, evidently for the sole purpose of generating an offsetting gain to be exhibited in Fidelity's 1970 Annual Report (Plaintiffs' exh. 6f; R. 114–115). As plaintiffs aptly point out, "This portion of the transaction was in effect a loan of $400,000.00 at 12% interest." (Plaintiffs' Proposed Findings of Fact, Finding No. 44).

Nevertheless, on December 31, 1970, the transaction was disallowed by the Ohio Department of Insurance, the contract was apparently terminated, and no evidence has been presented that the Fidelity corporation or its shareholders suffered any financial loss therefrom, or if a loss was suffered, in what amount (Plaintiffs' exh. 11, at 53).

### Misleading Proxy Statements

In the nature of a capsule summary, it is alleged finally by plaintiffs that proxy statements mailed to Fidelity shareholders during the years in question failed to disclose material information relative to each of the abuses claimed above: Zink's status as insurance broker and the commissions he received on the Amvets contract; the results of the Amvets program; Woodward and Johnson's stock transactions in Fidelity shares; Johnson's alleged conflict of interest in the MacJay Enterprises transaction; and the participation of the three defendants in the promotion of Fortune and CIC. These allegations are, in the main, true. Information relating to these transactions was not disclosed in any proxy materials until about 1970, when dissidence began to develop among a minority of Fidelity's shareholders and disclosures were made (See Plaintiffs' exh. 17, passim).

### OPINION

Stockholder derivative actions are not personal in nature or purpose. Under both the Securities & Exchange Act of 1934 and the common law of Ohio, they are, instead, actions to enforce the right of a corporation when it is harmed by the fraud or negligence of its officers and directors. Thus, an essential element of the derivative action

is proof that the corporation has in fact been damaged by the actions of such officers and directors. The mere failure to comply with business formalities, negligent or shoddy activities by corporate officers, even actual fraud—these are not actionable in the absence of proven economic detriment to the corporation's interest. See Kahn v. Schiff, 105 F.Supp. 973, 979 (S.D.Ohio 1952); Reynolds v. Texas Gulf Sulphur Co., 309 F.Supp. 548 (D.C.Utah 1970); Adair v. Schneider, 293 F.Supp. 393 (D.C.N.Y. 1968); Cohen v. Colvin, 266 F.Supp. 677 (D.C.N.Y.1967); Gordon v. Lipoff, 320 F.Supp. 905 (D.C.Mo.1970); Friedman v. Bache & Co., 321 F.Supp. 347 (D.C. Fla.1970). Also see, Masterson v. Pergament, 203 F.2d 315 (C.A.6 1953); Larwill v. Burke, 19 O.C.C. 513, aff'd. 66 Ohio St. 683, 65 N.E. 1130 (1902).

■ Damages in a derivative action are normally measured by the out-of-pocket loss suffered by the corporation. See, Johns Hopkins Univ. v. Hutton, 326 F.Supp. 250 (D.C.Md.1971); Greitzer v. United States National Bank, 326 F. Supp. 762 (D.C.Cal.1971); Chaney v. Western States Title Ins. Co., 292 F. Supp. 376 (D.C.Utah 1968); Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 303 F.2d 527, 533 (C.A.10 1962). See also 15 U.S.C.A. § 78bb(a). This "out of pocket" rule has, in the main, been interpreted to include actual losses—lost profits or unnecessary or extravagant outlays attributable to a defendant's fraudulent conduct—and not the gains which accrue to the defrauding party. See Estate Counseling Service, Inc. v. Merrill Lynch, id.; Baumel v. Rosen, 412 F.2d 571 (C.A.4 1969), cert. den. 396 U.S. 1037, 90 S.Ct. 681, 24 L.Ed.2d 681 (1970); but compare Myzel v. Fields, 386 F.2d 718 (C.A.8 1967), cert. den. 390 U.S. 951, 88 S.Ct. 1043, 19 L. Ed.2d 1143 (1968). What is stated, then, is a theory of compensation rather than rescission or restitution.

■ Applying these principles to the case at bar, it is apparent that a number of plaintiffs' claims are unsupported by proof of economic harm to the defendant corporation. The Fortune transactions have, for example, been profitable to the corporation and it cannot be seriously maintained that Fidelity under-invested in Fortune, thereby wasting a corporate opportunity; for, as we have already found, Fidelity's investment was limited by Ohio law. Nor may damages be awarded for the failure of Fidelity employees and representatives to bill Fortune for time expended on Fortune's organization; to do so, this Court would of necessity enter a realm of utter speculation and conjecture wherein we may not tread. See, e.g., Story Parchment Co. v. Paterson Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Eastman Kodak Co. v. Southern Photo Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927); Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946).

■ This principle applies equally to other transactions alleged by the plaintiffs to constitute fraud, negligence or breach of fiduciary duty by the individual defendants herein. The failure of defendant Zink to disclose, in proxy reports, his status as an insurance broker is arguably a significant omission, perhaps misleading to present and potential stockholders. However, in the absence of any proof that Mr. Zink diverted funds or, more saliently, that the corporation lost any monies, as a proximate result of this nondisclosure, it is not actionable. The Amvets contract lost money, to be sure, but it has not been shown that such loss was occasioned by any negligent or fraudulent act or omission by Mr. Zink. Similarly, no economic damage to the corporation has been shown to have resulted from either Johnson's short-swing receipt and sale of Fidelity stock (Fidelity resold the same stock on the open market and itself realized a profit) or the Professional Investors Reinsurance Agreement, which was disallowed by the Ohio Department of Insurance and apparently never went into effect. As to these transactions,

then, an essential element of plaintiffs' case has not been proved and there can be no recovery. See Beury v. Beury, 127 F.Supp. 786, 789–790 (D.C.W.Va. 1954), aff'd. 222 F.2d 464 (C.A.4 1955); Hoover v. Allen, 241 F.Supp. 213 (D.C. N.Y.1965); and cases cited at p. 261 *supra.*

With regard to the distribution of Fortune warrants upon the dissolution of the CIC corporation, and the conflict of interest presented by the MacJay lease transaction, this case stands in a somewhat different posture.

■■ We need not pause long as to the impropriety of the Fortune distributions. It is well established in Ohio that the obligation of a corporate officer to his corporation is fiduciary in character and that any act, direct or indirect, which benefits such officer or a special class of shareholders over other shareholders, to the detriment of the corporation, violates that fiduciary trust and is actionable. See, Commercial Banking & Trust Co. v. Tenants Realty Co., 37 Ohio App. 566, 175 N.E. 36 (1930); Taylor v. Miami Exporting Co., 5 Ohio 162 (1831); Goodin v. Cincinnati & W. Canal Co., 18 Ohio St. 169 (1868); Thomas v. Matthews, 94 Ohio St. 32, 113 N.E. 669 (1916); Kahn v. Schiff, *supra;* Straman v. North Baltimore Waterworks Co., 8 O.C.C. 89, 4 O.C.D. 339 (Wood Circuit Ct. 1893). When a corporate officer places himself in a position of conflicting loyalties and subsequently violates his primary duty to the corporation and all of its shareholders, an almost *per se* rule of liability applies. The Court need not find an actual intent to defraud; fraud may be presumed or implied, and the good, or neutral, intentions of the officer are immaterial. See Seagrave Corp. v. Mount, 212 F.2d 389, 397 (C.A.6 1952); Kahn v. Schiff, *supra,* 105 F.Supp. at 976.

■ Of course, if all material facts are disclosed to the corporate shareholders and, acting upon such disclosure, they approve or ratify the officer's actions, there is no liability. See

Claman v. Robertson, 164 Ohio St. 61, 128 N.E.2d 429 (1955). But no defense of ratification is raised in this case. Instead, defendants apparently contend only that the Fortune warrants had no value and consequently that the corporation did not lose anything by their malapportionment. See "Findings of Fact, Conclusions of Law and Legal Memorandum of Defendants," Finding No. 4, at p. 3. As previously indicated, we disagree with this contention. Defendants offered at trial no evidence, testimonial or otherwise, to rebut plaintiffs' proof that the warrants in question were worth $1.25 apiece, and we therefore accept such proof. We further find that the Fidelity corporation and its stockholders were entitled to 2909 warrants in addition to those it received, that the defendants diverted such warrants from the corporation to themselves, their relatives and friends, and that the defendants are accordingly liable to the plaintiffs in the amount of Three Thousand, Six Hundred Thirty-six and 25/100 Dollars ($3,636.25).

The rule of law to be applied to the MacJay transaction differs from that applicable above. In their briefs, plaintiffs appear to argue that the dual role played by defendant Johnson as lessor and lessee of office space to the Fidelity corporation, constituted a *per se* violation of his fiduciary duty to the corporation, making him liable for any profits derived by the lease contract. This is not the law of Ohio.

■ It is well recognized, in Ohio and practically all other jurisdictions, that transactions between corporations having directors or officers in common are not *per se* illegal or void. See, United States Rolling Stock Co. v. Atlantic & G.W.R. Co., 34 Ohio St. 450 (1878); Cooper v. Central Alloy Steel Corp., 13 O.L.A. 377 (Stark Cty.Ct. App.1931) (syllabus six); Larwill v. Burke, *supra,* 10 O.C.D. 579 (Cuyahoga Cir.Ct.1900); Cf. Berkwitz v. Humphrey, 163 F.Supp. 78, 97 (N.D.Ohio 1958) (applying Pennsylvania law).

Such transactions must, of course, be closely scrutinized, since the presence of an agent acting in dual capacity, with adverse interests, increases the likelihood of fiduciary abuses. See, U.S. Rolling Stock Co. v. Railroad, *supra*, 34 Ohio St. at 460. However, in the absence of a demonstration of fraud or bad faith, such transactions will not be set aside.

■ We conclude that plaintiffs have failed to make a showing of fraud or bad faith sufficient to warrant the divestiture of defendant Johnson's profits on the MacJay lease. Evidence showed that the lease price was duly authorized by the Board of Directors at a September, 1963, Directors' meeting. Neither the terms of Fidelity's sublease (approximately $3.70 per square foot) nor the actual profit made by MacJay ($133.33 per month on an investment by MacJay of $2083.33 per month, or an approximate 6% return), indicates any unfair dealing or breach of duty toward Fidelity shareholders. Indeed, both the price and the profit seem well within reason, and because we are unwilling to adopt a *per se* rule that any profit is necessarily excessive in such a situation, we decline to vacate the lease.

■ Nor do we deem the failure by the Board to disclose to Fidelity shareholders Mr. Johnson's status as a director of MacJay to be of controlling significance in this case. The authority of a corporation to make contracts, enter leases, etc., is vested exclusively in its Board of Directors, and unless such authority is exercised in an ultra vires, negligent, or fraudulent manner, as discussed above, the corporation's shareholders may not be heard to complain. See Boss v. Alms & Doepke Co., 17 Ohio App. 314; Selama-Dindings Plantations, Ltd. v. Durham, 216 F.Supp. 104 (S.D.Ohio 1963), aff'd. 337 F.2d 949 (C.A.6 1964). Since we have held that the lease in question was fair and drawn in good faith, it follows that the corporation did not suffer undue economic harm by its terms. This being the case, the failure of the directors to disclose a

potential but ultimately nondetrimental conflict of interest of negotiating parties is extraneous and irrelevant to plaintiffs' claim.

Accordingly, the Court orders that judgment be entered for defendants as to all causes of action stated except count 1 of plaintiffs' amended complaint and that as to count 1, judgment be entered against defendants Woodward, Johnson and Zink for Three Thousand, Six Hundred Thirty-six and 25/100 Dollars ($3,636.25).